Frederick Dewaynne **WALKER**,
**Appellant**

v.

**TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,**
**Appellee.**

**No. 01–07–00867–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

June 18, 2009.

Opinion Dissenting to Denial of En Banc Consideration Oct. 9, 2009.

---

William B. Connolly, Connolly & Shireman, LLP, Houston, TX, for Appellant.

Sandra D. Hachem, Senior Assistant County Attorney, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, HANKS, and BLAND.

## OPINION

GEORGE C. HANKS, JR., Justice.

After a bench trial, the trial court terminated the parental rights of appellant, Fredrick Dewaynne Walker ("Walker"), to his minor son, W.J.W., and named the Texas Department of Family and Protective Services ("DFPS") sole managing conservator of W.J.W. *See* TEX. FAM.CODE ANN. § 161.001 (Vernon 2008). On appeal, Walker challenges whether the evidence was legally and factually sufficient to support the termination of his parental rights and whether he was denied the effective assistance of trial counsel. We affirm.

## Background

On July 19, 2006, Walker's wife, Lauressa, gave birth to W.J.W. in Houston. Because both W.J.W. and Lauressa tested positive for cocaine at the time of birth, the hospital made a referral to DFPS. Lauressa admitted to hospital staff that she had used cocaine as recently as three days before W.J.W. was born, and the staff reported to DFPS that Walker had appeared to be intoxicated when he arrived at the hospital. Neither Walker nor Lauressa had any identification, money, or paperwork on them. When questioned by the DFPS caseworker at the hospital, Walker admitted that he had used drugs in the past and that he and Lauressa had three older children who were already in CPS custody in Florida. The DFPS caseworker also noted that Walker and Lauressa were homeless.

Based on evidence that (1) both Lauressa and W.J.W. tested positive for cocaine at W.J.W.'s birth, (2) the parents were homeless, and (3) both parents had previous criminal, drug, and CPS histories, DFPS requested to be named W.J.W.'s sole managing conservator. W.J.W. was then placed in a foster home. On August 3, 2006, the court signed an order requiring Walker to comply with each requirement set out in the DFPS service plan during the pendency of the suit, pursuant to section 263.106 of the Texas Family Code.

On January 9, 2007, Walker signed a Family Service Plan requiring him to attend parenting classes, to submit to random drug tests, to receive drug treatment, to maintain a stable environment, to maintain contact with W.J.W. on a weekly basis, to maintain suitable housing, to refrain from criminal activity, and to follow the recommendations of service providers. A DFPS caseworker explained the plan to Walker and told him that his parental rights to W.J.W. could be terminated if he did not comply. Walker stated to the worker that he understood the plan and that he would enroll in a rehabilitation program.

In April of 2007, DFPS filed a permanency progress report with the court, stating that Walker had not completed any services suggested by DFPS and had not made progress toward mitigating his parental termination action. The report also indicated W.J.W.'s current placement was a safe, stable, and nurturing environment and recommended that the parental rights of Walker and Lauressa be terminated. About a month after the April permanency progress report was filed, Walker tested positive for cocaine and marijuana. At trial, W.J.W.'s caseworker testified that

Walker had not visited W.J.W. since the day he was born.

During his testimony, Walker stated that he was currently living with his sister in Houston and that she had agreed to let W.J.W. live at her residence, too, if Walker was allowed to keep custody. When asked why DFPS had not done a home study on his sister's house, Walker stated, "she didn't—they—it was like she told me that it would be best for me just to relinquish my rights." He also testified that he had been clean for eight months before trial, although he had tested positive for marijuana and cocaine only two months earlier. When asked whether he knew that his wife had been using cocaine before W.J.W. was born, Walker gave contradictory answers.

At the close of trial, the court signed a judgment terminating Walker's parent-child relationship with W.J.W. and appointing DFPS as W.J.W.'s sole managing conservator.

## Sufficiency of the Evidence

In his first three issues, Walker argues that the evidence is both legally and factually insufficient to support the trial court's termination of his parental rights pursuant to Texas Family Code Section 161.001(1)(E), Section 161.001(1)(O), and Section 161.001(2). *See* Tex. Fam.Code Ann. § 161.001 (Vernon 2008).

## Standard of Review

■ Because parental-rights termination "is complete, final, irrevocable, and divests for all time that natural right . . .[,] the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985) (citing *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599 (1982)). Clear and convincing evidence "means the

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007 (Vernon 2008). This heightened burden of proof results in a heightened standard of review.

■ When determining legal sufficiency, we review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-rights-termination case, we must consider all of the evidence, not only that which favors the verdict. *City of Keller v. Wilson,* 168 S.W.3d 802, 817 (Tex.2005).

■ In determining factual sufficiency under the clear-and-convincing burden, we must consider whether the evidence is sufficient to produce a firm belief or conviction in the mind of the factfinder as to the truth of the allegation sought to be established. *In re C.H.,* 89 S.W.3d 17, 25–26 (Tex.2002). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.,* 96 S.W.3d at 266. "If, in light of

the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

■■ The natural rights that exist between parents and their children are of constitutional dimension. *Holick,* 685 S.W.2d at 20. Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21. However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.,* 89 S.W.3d at 26. For parental rights to be involuntarily terminated, it must be found by clear and convincing evidence that the parent engaged in conduct set out in subsection 161.001(1) and that termination would be in the child's best interest pursuant to subsection 161.001(2). TEX. FAM.CODE ANN. § 161.001 (Vernon 2008). Both elements must be established, and termination may not be based solely on the factfinder's determination of best interest of the child. *See Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *In re L.M.,* 104 S.W.3d 642, 646 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

### Grounds for Termination

In terminating Walker's parental relationship with W.J.W., the trial court expressly found:

- that Walker engaged in conduct or knowingly placed the child at issue in this suit with persons who engaged in conduct which endangers the child's physical or emotional well-being, pursuant to [Section] 161.001(1)(E);
- that Walker failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the child ... pursuant to Section 161.001(1)(O); and
- that termination of parental rights of ... Walker ... is in the best interest of the child.

In his first three issues, Walker challenges the legal and factual sufficiency of these findings.

### A. Endangerment

*Legal Sufficiency*

■■ We begin by considering the legal sufficiency of the trial court's section 161.001(1)(E) finding. To terminate a parent-child relationship based on section 161.001(1)(E), the trial court must find by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM.CODE. ANN. § 161.001(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Robinson v. Tex. Dep't of Protective & Regulatory Servs.,* 89 S.W.3d 679, 686 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d at 533). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd,* 727 S.W.2d at 533. However, danger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury. *Id.* The relevant inquiry is whether evidence exists that a parental

course of conduct endangered the child's physical or emotional well-being. *In re R.D.*, 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied). The conduct does not have to occur in the presence of the child. *Director of Dallas Cty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). And the conduct may occur before the child's birth and both before and after the child has been removed by the Department. *See In re S.M.L.D.*, 150 S.W.3d 754, 757–58 (Tex.App.-Amarillo 2004, no pet.); *Avery v. State*, 963 S.W.2d 550, 553 (Tex.App.-Houston [1st Dist.] 1997, no writ).

■■■ Mere imprisonment will not, standing alone, constitute engaging in conduct that endangers the physical or emotional well-being of a child. *See Boyd*, 727 S.W.2d at 533. However, when all of the evidence, including imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding under section 161.001(1)(E) is supportable. *Id.* at 533–34. If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child. *See Avery*, 963 S.W.2d at 553.

■■■ The record reflects Walker's incarceration on multiple occasions both before and after W.J.W.'s birth: driving while intoxicated (30 days); criminal assault against his wife (90 days); criminal assault against his mother-in-law (20 days); delivery of marijuana (90 days); and interfering with public duties (5 days). Even though three of these offenses occurred before W.J.W. was born, they can still be considered as part of a voluntary, deliberate, and conscious course of conduct that had the effect of endangering W.J.W. *See In re R.W.*, 129 S.W.3d 732, 738 (Tex.App.-Fort Worth 2004, pet. denied); *Harris v.*

*Herbers*, 838 S.W.2d 938, 942–43 (Tex. App.-Houston [1st Dist.] 1992, no writ). Conduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied).

■■■ Walker was arrested and jailed twice for criminal assault against his wife and his mother-in-law. Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child. *In re B.R.*, 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied). Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established. *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex.App.-Fort Worth 2000, pet. denied). Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future. *Schaban–Maurer v. Maurer–Schaban*, 238 S.W.3d 815, 824 (Tex.App.-Fort Worth 2007, no pet.); *In re M.G.M.*, 163 S.W.3d 191, 202 (Tex.App.-Beaumont 2005, no pet.).

■■■ The trial court heard evidence that Walker had tested positive for cocaine and marijuana after he had signed a Child Protective Services Family Service Plan and therefore knew that his parental rights were in jeopardy and that Walker had a prior history of drug use that included an arrest for delivery of marijuana. Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E). *See Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex.App.-Houston [1st Dist.] 2005, pet.

denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child). Evidence of narcotics use and its effect on a parent's life and ability to parent may establish that the parent has engaged in an endangering course of conduct. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (citing *In re R.W.*, 129 S.W.3d at 739).

The evidence presented with respect to Walker's pattern of crime, imprisonment, drug use, and violence against family members demonstrates a deliberate course of conduct from which a reasonable trier of fact could have found that Walker endangered W.J.W.'s emotional and physical well-being. When viewed in the light most favorable to the judgment, we hold that the evidence was legally sufficient to support the trial court's finding that Walker engaged in a deliberate course of conduct that endangered W.J.W. under section 161.001(1)(E).

*Factual Sufficiency*

In conducting our factual-sufficiency review, we must ascertain what disputed evidence, if any, exists as to the conduct in question. *In re J.W.*, 152 S.W.3d 200, 206 (Tex.App.-Dallas 2004, pet. denied). Neither Walker's history of imprisonment nor his history of assault against family members is disputed. The only facts that Walker disputes relate to his illegal drug use. During trial, Walker testified that he had been clean for the previous eight months, even though he had tested positive for cocaine and marijuana only a few months earlier. A rational trier of fact could have chosen to believe the positive drug test results over Walker's testimony, viewed the evidence as a whole, and reasonably formed a firm belief or conviction that Walker had engaged in conduct that endangered the physical or emotional well-

being of W.J.W. Thus, the evidence is factually sufficient to support the trial court's finding on the section 161.001(1)(E) ground. We overrule Walker's first issue.

## B. Failure to Comply with Court Order

Because we conclude that the evidence is both legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), and because a finding as to any one of the acts or omissions enumerated in section 161.001(1) is sufficient to support termination, we need not address Walker's second issue challenging the trial court's findings under section 161.001(1)(O). However, we must still determine whether the evidence was sufficient to support the trial court's finding that termination was in W.J.W.'s best interest, pursuant to section 161.001(2).

## C. Best Interest of the Child

In his third issue, Walker challenges the legal and factual sufficiency of the trial court's finding, pursuant to Section 161.002(2), that termination was in W.J.W.'s best interest. *See* TEX. FAM.CODE ANN. § 161.001(2) (Vernon Supp. 2008).

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interests of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex.2002); *L.M.*, 104 S.W.3d at 647. In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interest of the child. 544 S.W.2d 367, 371–72 (Tex.1976). These factors include (1) the desires of the child; (2) the emotional and physical needs

of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice. *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex. App.-Houston [1st Dist.] 1986, no writ).

*The desires of the child*

At trial, W.J.W. was only one year old and, thus, too young to express his desires. However, there is no reason to believe that W.J.W. has any conscious knowledge of Walker, as he has not seen W.J.W. since the day that he was born.

*The child's physical and emotional needs, now and in the future*

▉ The goal of establishing a stable, permanent home for a child is a compelling state interest. *In re C.E.K.*, 214 S.W.3d 492, 498 (Tex.App.-Dallas 2006, no pet.). Walker has not seen W.J.W. since the day that the child was born. Walker testified

that he has not been employed since May 2005 (more than a year before W.J.W. was born). Walker also has not had stable housing at any point during W.J.W.'s life, and he has failed to comply with any part of the Family Service Plan implemented by DFPS. At the time of W.J.W.'s birth, both Walker and Lauressa were homeless, intoxicated, and had no identification, money, or paperwork with them—indications that they were not prepared to act as parents to an infant. Walker's inability to provide a stable home, to remain gainfully employed, or to comply with his court-ordered service plan, taken together with Walker's drug use and criminal activity since W.J.W. was born, supports the trial court's finding that Walker has not been and would not be able to provide for W.J.W.'s emotional or physical needs in any type of permanent way.

*The emotional and physical danger to the child, now and in the future*

The evidence regarding endangerment, discussed in support of the trial court's finding under section 161.001(1)(E) above, is also probative of a finding as to danger in determining the child's best interest. *See C.H.*, 89 S.W.3d at 28.

*The parental abilities of those seeking custody*

In July 2004, Walker was arrested in Florida for child neglect because he left his oldest three children in a car while he was out looking for their mother. These charges were dropped and the Florida CPS report was closed because the Department was unable to locate the family. A year later, Walker's three children were taken into custody by Florida's CPS Department after it received a report from Lauressa's relatives that the family was living in a car, traveling from state to state, and the parents were using drugs with children in the back seat. It was

reported that neither parent worked and that the children had not been seen in school for over a year. The three children were then placed in the care of Lauressa's mother, Lisa Hale, in Florida. Walker showed no interest in caring for W.J.W. and had not seen him since the day the child was born. This, when considered with Walker's two criminal assault charges against his family members and his criminal and drug history, is sufficient to show Walker's lack of parental abilities.

*Programs available to assist parents in promoting the child's best interests*

There was no evidence presented at trial that Walker has participated in any of the programs outlined in the Family Service Plan. Walker told his DFPS caseworker that he was enrolled in a rehabilitation program, but when the caseworker called the number, it turned out to be a shelter and not a rehabilitation center.

*Plans for the child by the individual or agency seeking custody*

Although Walker testified that his sister was willing to allow W.J.W. to live in her house, he admitted upon further questioning that his sister also told him that it would be best if he would just relinquish his rights. DFPS planned for W.J.W. to be adopted. W.J.W.'s current caregiver had expressed an interest in adopting him and testified that she loved him and wished to provide a safe and loving environment for him.

*The stability of the home or proposed placement*

The DFPS caseworker testified that W.J.W. was thriving in his current placement and was bonded to his current caregivers. She said that the placement home seems safe and appropriate and that all of W.J.W.'s needs were being met and would be met in the future.

*Parent's acts or omissions that indicate the current parent-child relationship is improper and parent's excuses for those acts or omissions*

Currently, Walker and W.J.W. have no parent-child relationship. Walker has not seen his son at any scheduled visitations arranged by DFPS. Walker apparently did show up for one visit, but a miscommunication with the caseworker about the date prevented him from seeing the child. The factfinder could reasonably have concluded that this one failed attempt did not excuse Walker's failure to visit his son over an entire year.

In light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Walker's parental rights was in W.J.W.'s best interest. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Walker's parental rights was in the best interest of W.J.W.

We overrule Walker's third issue. Having done so, we need not address his fourth issue, which requests that we reverse the appointment of DFPS as sole managing conservator should we conclude that the trial court erred in terminating his parental rights.

## Ineffective Assistance of Counsel

We discuss Walker's fifth and sixth issues together. In his fifth issue, Walker contends that Sections 263.405(b) and (i) of the Texas Family Code violate the separation of powers provision of the Texas Constitution and deny him due process of law because their operation prevented him from preserving a challenge of ineffective assistance of counsel.[1] In his sixth issue,

---

1. The challenged sections require a party appealing the termination of parental rights to

Walker asserts that he received ineffective assistance of counsel at trial.

We may examine the unpreserved sixth issue in order to determine the validity of Walker's due process challenge. The Texas Supreme Court presumes that the rules governing preservation of error in civil cases, including parental-rights-termination cases, comport with due process of law. *See In re B.L.D.*, 113 S.W.3d 340, 352–54 (Tex.2003), *cert. denied*, 541 U.S. 945, 124 S.Ct. 1674, 158 L.Ed.2d 371 (2004). However, the Texas Supreme Court has also acknowledged that, in a given parental-rights-termination case, a particular "calibration" of the procedural due process factors outlined by the United States Supreme Court in *Mathews v. Eldridge* [2] could require a court of appeals to review an unpreserved complaint of error as part of a fact-specific analysis to ensure that a particular litigant was not denied due process. *Id.* at 354 (citing *Lassiter v. Dep't of Soc. Services*, 452 U.S. 18, 32–34, 101 S.Ct. 2153, 2162–63, 68 L.Ed.2d 640 (1981)). In a case decided on the same day as *B.L.D.*, the Texas Supreme Court held that "our procedural rule governing factual sufficiency preservation must give way to constitutional due process considerations" when a parent's counsel in a parental-rights-termination case unjustifiably fails to preserve a factual-sufficiency complaint. *In re M.S.*, 115 S.W.3d 534, 546–50 (Tex.2003). Additionally, the Beaumont Court of Appeals has examined unpreserved jury charge error in order to determine whether the parent in a parental-rights-termination case was denied effective assistance of counsel. *In re S.A.S.*, 200 S.W.3d 823, 828–30 (Tex.App.-Beaumont 2006, pet. denied). In determining whether we must review Walker's unpreserved complaint, we weigh the *Eldridge* factors and balance the net result against the presumption that Sections 263.405(b) and (i) of the Texas Family Code comport with constitutional due process requirements. *M.S.*, 115 S.W.3d at 547.

Applying the principles set out in the cases discussed and cited above, we determine that we must examine Walker's unpreserved complaint. Although the State certainly has an interest in ensuring that parental-rights-termination proceedings are expeditious, final, and governed by consistently applied procedural rules, the costs to both the parent and the child of an inaccurate, unjust decision outweigh the benefits of preserving judicial efficiency. Further, as noted by the Texas Supreme Court in *M.S.* and the United States Supreme Court in *Santosky v. Kramer*, the State has an interest in protecting the welfare of the child, and that interest must initially manifest itself by working toward preserving the familial bond rather than severing it. *M.S.*, 115 S.W.3d at 548; *Santosky*, 455 U.S. 745, 766–67, 102 S.Ct. 1388, 1401–02, 71 L.Ed.2d 599 (1982). " '[T]he State registers no gain towards its declared goals when it separates children from the custo-

file a statement of appellate points with the trial court. Issues omitted from the statement are not preserved for appeal. The statement of appellate points must be filed with the trial court no later than the 15th day after the signing of an order terminating parental rights.

**2.** In *Eldridge,* the United States Supreme Court held that identifying the requirements of procedural due process generally requires consideration of: (1) the private interest affected by the proceeding or official action; (2) the risk of an erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

dy of fit parents.'" *Santosky,* 455 U.S. at 767, 102 S.Ct. at 1402 (quoting *Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972)). Thus, the State's interest in meeting its ultimate goal of ensuring the safety and stability of the child is best served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home. *See M.S.,* 115 S.W.3d at 549; *Santosky,* 455 U.S. at 767, 102 S.Ct. at 1402. To that end, it is important to protect the Constitutional right to effective counsel of a parent facing the loss of his or her children.

In this case, Walker, who is indigent, was represented by a court-appointed lawyer at trial and is being represented by a different court-appointed lawyer on appeal. Given this situation, we note that, even under the most favorable of circumstances, it would be extremely difficult for the appellate lawyer to procure a trial transcript and clerk's record, familiarize himself with the case, evaluate the performance of trial counsel, and file a statement of appellate points with the court within the fifteen-day window provided by the statute. Failure to meet this swift deadline would bar the appellate court from considering what may be a valid challenge of ineffective assistance of counsel. We conclude that, in this case, the procedural rule must give way out of concern for due process of law. *See B.L.D.,* 113 S.W.3d at 352–54; *M.S.,* 115 S.W.3d at 546–50; *S.A.S.,* 200 S.W.3d at 828–30. Accordingly, we now examine the merits of Walker's challenge of ineffective assistance of counsel.

### Standard of Review: Ineffective Assistance

■■■ To successfully assert a challenge of ineffective assistance of counsel, a defendant in a parental-rights-termination case must show that his or her counsel's performance was deficient and that this deficiency prejudiced the defense. *In re J.P.B.,* 180 S.W.3d 570, 574 (Tex.2005) (citing *In re M.S.,* 115 S.W.3d at 545) (citing *Strickland v. Washington,* 466 U.S. 668, 687–92, 104 S.Ct. 2052, 2063–67, 80 L.Ed.2d 674 (1984)). This standard requires a showing that counsel's errors were serious enough to deprive the defendant of a fair trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. There is a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance, including the possibility that counsel's decision was based on strategy. *M.S.,* 115 S.W.3d at 549 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065).

■■■ In deciding whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case and focus primarily on whether counsel performed in a "reasonably effective" manner. *M.S.,* 115 S.W.3d at 545 (citing *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65). It is only when the conduct was "so outrageous that no competent attorney would have engaged in it" that the challenged conduct will constitute ineffective assistance. *M.S.,* 115 S.W.3d at 545 (quoting *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001)).

■■■ If a reviewing court concludes that the conduct of Walker's counsel was deficient, the court must then determine if that conduct was prejudicial to him by assessing whether "'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *see also M.S.,* 115 S.W.3d at 550; *Garcia,* 57 S.W.3d at 440. *Strickland's* appellate record requirement applies to ineffective assistance challenges in termination cases: "'An allegation of ineffective

assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.' " *In re K.K.,* 180 S.W.3d 681, 685 (Tex.App.-Waco 2005, no pet.); *see also Thompson v. State,* 9 S.W.3d 808, 813–14 (Tex.Crim. App.1999). Failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness challenge. *See Thompson,* 9 S.W.3d at 813.

 Walker presented his ineffective-assistance challenge to the trial court in a supplemental motion for new trial, and the trial court overruled Walker's complaint by denying his supplemental motion for new trial. We therefore analyze Walker's ineffective-assistance-of-counsel issue as a challenge to the denial of his supplemental motion for new trial. *Biagas v. State,* 177 S.W.3d 161, 170 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd) (citing *Charles v. State,* 146 S.W.3d 204, 208 (Tex. Crim.App.2004), *superseded in part on other grounds by* Tex.R.App. P. 21.8(b)). In such circumstances, we review the *Strickland* test through an abuse of discretion standard. *Id.* Thus, we reverse only if the trial court's decision is arbitrary or unreasonable, viewing the evidence in the light most favorable to the ruling. *Id.; see also Webb v. State,* 232 S.W.3d 109, 112 (Tex.Crim.App.2007) ("[A] trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling."). In reviewing a trial court's ruling on a motion for new trial, we give almost total deference to the trial court's determination of historical facts that are supported by the record, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Charles,* 146 S.W.3d at 206; *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). We may also rely upon implied findings of fact that are supported by the record to uphold the trial court's ruling even when the trial court is not faced with expressly conflicting affidavits or testimony. *Charles,* 146 S.W.3d at 206.

### Analysis

██ ██ First, Walker argues that his counsel was ineffective because his court-appointed lawyer was not present at the termination trial but had sent his brother, who practices law with him, in his place. The record reflects this substitution but no explanation for the switch. We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions. *See Gamble v. State,* 916 S.W.2d 92, 93 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (citing *Jackson v. State,* 877 S.W.2d 768, 771 (Tex. Crim.App.1994)). Furthermore, Walker has failed to affirmatively show that this substitution constituted a deficiency or that the outcome of the case would have been different had his appointed counsel actually appeared at trial.

██ Next, Walker argues that his attorney failed to make hearsay objections at trial and to properly cross-examine the witnesses. However, Walker's appellate counsel did not question his trial counsel regarding these omissions during the motion for new trial hearing. Due to the lack of evidence in the record regarding trial counsel's reasons for cross-examining the witnesses as he did and for not objecting to certain testimony and evidence, we cannot conclude that trial counsel's performance was deficient. Walker has not rebutted the presumption that trial counsel made his decisions in the exercise of reasonable professional judgment.

██ Finally, Walker argues that he received ineffective assistance of counsel because, he alleges, neither of his two attorneys conducted a pretrial investigation.

Walker attached an affidavit to his supplemental motion for new trial asserting that the attorneys did not return several phone messages left by Walker, interview any witnesses, inform Walker of his rights and obligations, or familiarize themselves with his case before trial. The affidavit also stated that such investigation would have "brought out information and testimony that would have directly contradicted and refuted the evidence against [Walker]." Walker reiterated many of these statements on the stand at the motion for new trial hearing and argues that, at the hearing on his motion for new trial, his affidavit and testimony were largely uncontroverted by the attorneys who represented him.[3]

After reviewing the entire record in this case, we conclude that it was not unreasonable for the trial court to discredit Walker's testimony regarding the investigative efforts and conduct of his attorneys and to find that he received effective counsel. A trial court sitting as the trier of fact is not required to accept as true the statements made in an affidavit, even if that affidavit is uncontradicted. See Biagas, 177 S.W.3d at 171; Charles, 146 S.W.3d at 213 (holding that, although affidavits averring that trial counsel had not conducted any independent investigation into voluntariness of defendant's confession were uncontroverted, trial court did not abuse discretion in denying motion for new trial on grounds of ineffective assistance of counsel). The same is true of live testimony. See State v. Ross, 32 S.W.3d 853, 855 (Tex.Crim.App.2000) (citing Mattias v. State, 731 S.W.2d 936, 940 (Tex.Crim.App.1987)); see also Nelson v. Najm, 127 S.W.3d 170, 174 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (applying identical rule in civil bench proceeding—trial court may "take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony"). Further, the uncontradicted testimony of an interested witness cannot be considered as doing more than raising an issue of fact to be decided by the trial court if there are circumstances in evidence tending to discredit or impeach the interested witness's testimony. See Anchor Cas. Co. v. Bowers, 393 S.W.2d 168, 169 (Tex.1965).

The record in this case discredits and impeaches the veracity of Walker's testimony. The trial court was well aware at the time of Walker's testimony of his history of drug use, crime, and imprisonment and the fact that Walker had never even visited W.J.W. The record also reflects that, on at least one occasion during the termination trial, Walker's testimony under oath was in direct contradiction of the facts established by the court records admitted into evidence. While under oath at his termination trial, Walker testified that he had last used illegal drugs "maybe like eight months" before the trial. However, in the same proceeding, the trial court received evidence that Walker had in fact failed a court-ordered drug test just over two months before the trial.[4] Similarly,

3. We note that, at the hearing, Walker's trial attorney neither controverted nor admitted as true the statements in Walker's affidavit. After testifying as the first witness in the hearing on the motion for new trial, Walker's counsel testified as follows:
Q: All right. I understand. Is there any other evidence that you would like to offer to the Court in terms of or in contradiction to the affidavit that Mr. Walker has?
A: No.
There was no cross-examination of this testimony.

4. The results of the drug test establish that Walker was under the influence of drugs on the day of his last court appearance before his trial. Walker was represented by counsel at this hearing.

Walker did not admit to assaulting W.J.W.'s mother in 2000, although opposing counsel pointed out to him that she had a copy of a judgment establishing that he had pleaded guilty to this offense.[5]

In addition, the transcript of Walker's direct examination by his counsel discredits Walker's claims that his counsel conducted no pretrial investigation of this matter. Although relatively brief, the examination is precise and focused on eliciting a series of facts that could be helpful to Walker's claims. With the exception of Walker's testimony regarding his contacts with CPS and past drug use, the elicited facts were largely uncontradicted on cross-examination by DFPS. Counsel asked Walker about the alleged failure of CPS to communicate with him during the process; the fact that he was currently living with his sister, who was employed, would help take care of W.J.W., and was willing to undergo a home study for her suitability to be involved in W.J.W.'s life; Walker's employment skills and job prospects; and Walker's alleged involvement in the lives of his other four children. These facts were elicited from Walker despite the fact that Walker was not even present at the beginning of the termination trial and did not appear until the end of the trial, right before his testimony. The record reflects that, after Walker arrived in court, there was only a short recess before he was placed on the stand to testify. Under these circumstances, we conclude that these questions illustrate counsel's familiarity with the material facts of the case

and discredit Walker's allegations that his counsel did not conduct any pretrial investigation in this matter.[6]

■ Even if, as the dissent urges, we give no deference to the trial court's determination of historical facts, Walker's challenge of ineffective assistance of counsel still fails. The record simply does not affirmatively show a reasonable probability that, but for the conduct of Walker's counsel, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Thompson,* 9 S.W.3d at 812. When asked, at the hearing on his motion for new trial, what evidence proffered by DFPS he could have refuted had his counsel conducted an adequate pretrial investigation, Walker was not able to identify any evidence that had not been produced at the termination trial that would have changed its outcome.

Accordingly, we hold that the trial court did not abuse its discretion in rejecting Walker's testimony and affidavit regarding his counsel's conduct and denying Walker's supplemental motion for new trial on the ground of ineffective assistance of counsel. We overrule Walker's sixth issue.

### Due Process

■ Having examined the record and found Walker's ineffective assistance of counsel challenge to be without merit, we do not reach his fifth issue because Walker cannot show that the operation of the challenged statute caused him harm. *See Cen-*

---

**5.** Walker later testified in the hearing on the motion for new trial that "just because you get convicted of assault doesn't mean that you assaulted anybody." The record also reflects that when asked questions that could be harmful to his case, for example regarding his awareness that his wife was using cocaine and his current employment status, Walker was evasive in his responses.

**6.** Although the dissent is critical of the brevity of Walker's direct examination, given Walker's history of drug abuse, including the fact that he had been under the influence of drugs at his last court appearance, and his late arrival at the termination trial, we cannot conclude that Walker's counsel's decision to limit Walker's time on the stand was not a valid strategic decision.

*terPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities,* 252 S.W.3d 1, 31 (Tex.App.-Austin 2008, no pet.) ("[I]n making a due-process claim, a party must show that a due-process violation occurred and that he or she was harmed by that violation.") (citing *Hammack v. Public Util. Comm'n,* 131 S.W.3d 713, 730 (Tex. App.-Austin 2004, pet. denied)) (citing *Vandygriff v. First Sav. & Loan, Etc.,* 617 S.W.2d 669, 673 (Tex.1981)). Additionally, our disposition of Walker's sixth issue effectively disposed of the case. Texas courts will not pass on the constitutionality of a statute when the case may be decided on independent, alternative grounds. *Baptist Hosp. of Southeast Tex., Inc. v. Baber,* 714 S.W.2d 310, 310 (Tex.1986); *San Antonio General Drivers, Helpers Local No. 657 v. Thornton,* 156 Tex. 641, 647, 299 S.W.2d 911, 915 (1957) (orig. proceeding).

### Conclusion

We affirm the trial court's judgment.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

In regard to the ineffective assistance of counsel issue of appellant, Frederick Dewaynne Walker, the majority misunderstands the crux of appellant's issue, applies the wrong standard of review for ineffective assistance of counsel claims, and mischaracterizes appellant's conclusive evidence in support of his ineffective assistance claim as "discredit[ed]" and "impeach[ed]." Accordingly, I respectfully dissent.

### Background

In his Supplemental Motion For New Trial, Walker argued that he was entitled to a new trial in the suit brought by appellee, the Texas Department of Family and Protective Services ("DFPS"), to terminate Walker's parental rights to his child because "there can be no legitimate strategy involved if [an] attorney never consults with [a] client prior to trial, never investigates, never does any discovery, never interviews the client or his witnesses, and never calls anyone as a witness on his behalf."

Walker attached to his motion his affidavit, in which he testified that the trial court had not appointed him counsel until January 9, 2007 and this first appointed attorney never met with him. On April 26, 2007, the trial court appointed a second attorney ("appointed trial counsel") to represent Walker, and Walker finally "met" this attorney on May 10, 2007. Walker explained:

From May 10, 2007 until the trial of the case through August 30, 2007 I never had a conversation with [appointed trial counsel]. I called his office at least five (5) times and was told he was not in the office so I left messages. [Appointed trial counsel] did not appear to represent me at trial. His brother . . . actually appeared on his behalf for trial.

I had no office conferences and no telephone conferences with any of these lawyers. No witnesses were interviewed or called as witnesses in my behalf at trial. To the best of my knowledge, information and belief, no investigation of the case was done. If any investigation was done, I have never been told of the results.

I was not informed by anyone as to exactly what I had to do relative to any services on the Family Service Plan, except for rehabilitation at Houston Recovery Campus ("HRC"). I was never given any other referrals for services. To the best of my knowledge, information and belief, neither of my attorneys

engaged in any discovery about the case. I went to trial without ever having met and discussed my case with either of the lawyers who were supposed to be representing me during the case. [Appointed trial counsel's brother] knew nothing about me or my case.

He did not question the witnesses against me, based upon any information from me, and when those witnesses provided the court with information that was not true, he had no prior information from me, did not know to ask me and did not ask me any questions which would have brought out information and testimony that would have directly contradicted and refuted the evidence against me. I *respectfully assert that I was, in essence, not represented at trial.* The representative was ineffective. *There was no assistance of counsel.* No attempt was made to ascertain, develop or present testimony of all the times I unsuccessfully tried to get a hold of [my caseworkers], how poorly I was treated, how I was told I should relinquish my rights because I could not win.

. . . .

Since DFPS took custody, I have never been allowed to see my child. [My case worker] only made one attempt to make one (1) appointment for a visit to see my child. I took a bus to her office and waited for 1½ hours until I was told that there would be no visit because she was in court. No other visits were scheduled and to my knowledge none of the attorneys requested or insisted upon my rights as a father to see my child.

(Emphasis added). At the hearing on Walker's new trial motion, he repeated and elaborated on his affidavit testimony.

The majority concludes that it was not "unreasonable" for the trial court to "discredit" Walker's evidence that his appointed trial counsel had wholly failed to meet with him to discuss the case, failed to investigate the case, failed to interview witnesses and potential witnesses, failed to conduct discovery, and failed to prepare for trial.

However, contrary to the majority's conclusion, Walker's evidence was in no way discredited or impeached. In fact, the only attempt that DFPS made during its cross-examination of Walker to impeach his testimony concerned his status as an indigent. When the trial court stated "let's stick to the facts that warrant or don't warrant the motion for new trial not the indigency," and asked DFPS if it had "[a]nything else," DFPS responded, "No, Your Honor."

More importantly, when Walker's appointed trial counsel was asked on direct examination if he had any "evidence that [he] would like to offer to the court in term's of or in contradiction to [Walker's] affidavit," appointed trial counsel answered, "No." DFPS made no attempt at all to examine or rehabilitate Walker's appointed trial counsel at the hearing.

The bottom line is that the trial court, acting as the fact-finder, had no discretion to disregard Walker's undisputed testimony that allows only one logical inference. *See City of Keller v. Wilson,* 168 S.W.3d 802, 814–16 (Tex.2005). Here, a reasonable fact-finder could only conclude that Walker was totally deprived of any meaningful assistance of counsel.[1]

---

1. In oral argument, when asked to direct this court to "any evidence in the record" showing that Walker had received "any meaningful assistance of counsel" below, appellate counsel for DFPS asserted that Walker had failed a drug test and implied that his appointed trial counsel could have therefore concluded that Walker was unworthy of any such legal representation.

## The Issue Presented

In his sixth issue, Walker argues that he received ineffective assistance of counsel in DFPS's suit to terminate his parental rights to his child because his appointed trial counsel "should have met with [him] prior to trial, investigated the case, interviewed witnesses and potential witnesses, conducted discovery, and made some effort at preparation for trial." Not only did Walker conclusively prove that his appointed trial counsel did none of these things, he also conclusively proved that his appointed trial counsel did not even show up for Walker's trial. Rather, the appointed trial counsel sent his brother, who did not meet appellant until after DFPS had completed its case, to defend Walker in the trial below.

DFPS argues that Walker "fails to establish proof for an ineffectiveness claim because he does not establish that his attorney's performance was deficient or that his attorney's deficiency in any way prejudiced his defense."

The majority, in a single paragraph, dismisses Walker's main point, claiming that he has failed to "show that this substitution constituted a deficiency or that the outcome of the case would have been different had his appointed counsel actually appeared at trial."

However, the crux of Walker's issue is not that his trial counsel's performance was merely deficient as discussed by the majority. He is not complaining simply of trial counsel's errors, omissions, and strategic blunders. Rather, the crux of his argument is that he was, in effect, denied any meaningful assistance of counsel altogether. Walker's primary point is that he was effectively abandoned and received no defense at all.

## Presumed Prejudice

The Texas Supreme Court has held that the statutory right to counsel in parental-rights termination cases "embodies the right to effective counsel." *In Re M.S.*, 115 S.W.3d 534, 544 (Tex.2003); *see* Tex. Fam.Code Ann. § 107.013(a)(1) (Vernon 2008). Accordingly, the Texas Supreme Court further decided that the appropriate standard for determining whether counsel is effective in civil parental-rights termination cases is the same as that applied in criminal cases as set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *In Re M.S.*, 115 S.W.3d at 544–45. Generally, a criminal defendant asserting a claim for ineffective assistance of counsel based on the errors and omissions of his attorney must show that his attorney's performance was deficient and below an objective standard of reasonableness and that the deficient performance prejudiced his defense, i.e., but for the attorney's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Specifically, however, the United States Supreme Court in *Strickland* expressly explained that in the context of certain ineffective assistance of counsel claims, "prejudice is presumed." *Id.* at 692, 104 S.Ct. at 2067. For example, "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Id.* As explained by the Supreme Court in *United States v. Cronic*,

> The [Sixth] Amendment requires not merely the provision of counsel to the accused, but "Assistance," which is to be "for his defence." ... If no actual "Assistance" "for" the accused's "defence" is provided, then the constitutional guarantee has been violated. To hold otherwise "could convert the appointment of

counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment."

466 U.S. 648, 654–55, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984) (quoting *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940)).

Here, Walker's uncontradicted and unimpeached evidence conclusively establishes that although the trial court formally appointed an attorney to represent him, Walker, in fact, received no actual "assistance" at all for his "defense." Not only did appointed trial counsel fail to discuss the case with Walker, he actually abandoned Walker and sent his brother, who had never met Walker, to trial in his stead. As pointed out by Walker in his brief to this court, there is no evidence in the record that any attempt was made by counsel to comply with Texas Rule of Civil Procedure 10 or that Walker in any way agreed to this substitution of trial counsel. Instead, appointed trial counsel's brother showed up on the trial date to represent Walker without ever having met him. In fact, the trial record itself establishes that the brother of Walker's appointed trial counsel did not even meet with Walker until DFPS had completed its case. The appointment of trial counsel in this case does not even rise to the level of being a "sham." When given the opportunity to directly contradict Walker's affidavit testimony at the new trial hearing, appointed trial counsel did not even offer a pretense of having provided any actual assistance to Walker.

It should come as no surprise at all that while Walker was mistakenly sitting in another courtroom waiting for his appointed trial counsel to show up, appointed trial counsel's brother allowed the trial against Walker to proceed without objection. After Walker made it to the correct courtroom after DFPS had presented its case, appointed trial counsel's brother placed Walker on the witness stand after a "short" recess.

The trial transcript in this case is only sixty pages long. Of those sixty pages, only forty-one of the pages are devoted to any actual testimony. Of the forty-one pages of testimony, only five pages cover trial counsel's direct examination of Walker. Conservatively estimating forty-five seconds per page, Walker's parental rights were terminated in approximately forty-five minutes, less than four minutes of which were devoted to appointed trial counsel's brother's direct examination of Walker. In fact, the first thirteen pages of the trial transcript are taken up by trial counsels' stipulation of evidence, and appointed trial counsel's brother offered "no objection" to all thirteen exhibits, which contain hearsay evidence that is irrelevant to the actual allegations that DFPS made against Walker.[2] The cross-examination of witnesses made by appointed trial counsel's brother takes up only approximately four pages of the transcript or approximately three minutes. Thus, the "assistance" of counsel provided to Walker was not merely deficient, it was nonexistent.

The "assistance" of counsel provided to Walker in this case is far below that afforded to the criminal defendant in the infamous "sleeping-lawyer case." *See Burdine v. Johnson,* 262 F.3d 336 (5th Cir.2001). In *Burdine,* the court held that

---

2. Although some of the information presented in these exhibits might possibly amount to more than a scintilla of evidence against Walker, the poor state of the trial record makes this extremely difficult to discern.

because defense counsel repeatedly slept in trial while evidence was being introduced against the defendant, the defendant was denied counsel. *Id.* at 338. Thus, it was presumed that counsel's unconsciousness prejudiced the defendant. *Id.* The court emphasized,

> Unconscious counsel equates to no counsel at all. Unconscious counsel does not analyze, object, listen or in any way exercise judgment on behalf of a client.... When we have no basis for assuming that counsel exercised judgment on behalf of his client during critical stages of trial, we have insufficient basis for trusting the fairness of that trial and consequently must presume prejudice.

*Id.* at 349.

Although Burdine's lawyer slept through portions of the trial, it is at least possible that he actually prepared for trial. Here, the undisputed evidence reveals that Walker's appointed trial counsel never discussed the case with Walker and then abandoned Walker on the trial date. Appointed trial counsel's brother did not even meet Walker until after DFPS had presented its case against Walker. Neither attorney investigated the case, interviewed witnesses or potential witnesses, conducted discovery, or made any effort at preparation for trial. In short, appointed trial counsel's brother went into Walker's trial blind and could not possibly have exercised sound judgment on Walker's behalf.

The "assistance" of counsel provided to Walker is comparable to that provided to the defendant by the lawyer in the "potted plant" case. *See Childress v. Johnson*, 103 F.3d 1221 (5th Cir.1997). In *Childress*, the defendant complained that his attorney, appointed by a district court "a minute or two" before his plea of guilty to help him execute a jury-trial waiver, provided "no meaningful assistance" of counsel. *Id.*

at 1222–23. The court agreed, noting that the appointed lawyer "never investigated the facts, never discussed the applicable law with Childress, and never advised him of the rights he would surrender by pleading guilty." *Id.* at 1223. The Court explained,

> That a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.

*Id.* at 1228 (quoting *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063). The right to counsel "encompasses the right to have an advocate for one's cause." *Id.* Noting that the United States Supreme Court has "dispensed with the *Strickland* prejudice inquiry in cases of actual or constructive denial of counsel," the court explained that when a defendant can establish that counsel was not merely incompetent but inert, prejudice will be presumed. *Id.* The court held that although Childress's counsel at his plea in the 1940's was "more sentient than a potted plant," the lawyer "was not the advocate for the defense whose assistance is contemplated by the Sixth Amendment." *Id.* at 1231.

Here, likewise, appointed trial counsel and his brother, who merely appeared at the trial on behalf of appointed trial counsel, having never even discussed the case with Walker, did nothing to advocate Walker's cause. The cursory trial transcript reflects nothing but the equivalent of a drawn-out guilty plea, entered by the brother of appointed trial counsel, to which Walker did not consent.

## Conclusion

Walker, at the hearing on his Supplemental Motion for New Trial, conclusively

established that he received no meaningful assistance of counsel in the trial court. Because Walker received no meaningful assistance of counsel in the trial court, prejudice is legally presumed. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2046–47; *Burdine,* 262 F.3d at 349; *Childress,* 103 F.3d at 1228. Accordingly, I would hold that the trial court erred in denying Walker's motion for new trial. I would sustain his sixth issue and remand the case to the trial court for a new trial. The majority's holding to the contrary is a grave error. Like the "sleeping-lawyer" case, this case will stand as a significant embarrassment in the history of Texas jurisprudence.

JIM SHARP, Justice, dissenting to denial of en banc consideration.

The standard set forth in TRAP 41.2(c) regarding an appellate court's *en banc* consideration of a case speaks to "extraordinary circumstances requiring *en banc* consideration."

It is my position that both the panel's opinion and dissent thereto, illustrate the case to be worthy of the additional analyses to be obtained from the full court. Here the issue reduces to what action or absence of action by counsel constitutes "an actual or constructive denial" of "any meaningful assistance of counsel" in light of *Burdine v. Johnson,* 262 F.3d 336 (5th Cir.2001). I believe it to be an extraordinary circumstance that no appellate court has addressed this issue with respect to the denial of effective assistance of counsel in termination of parental rights cases.

The level of public scrutiny upon Texas jurisprudence in this area of effective assistance of counsel is already heightened due, in part, to the Court of Criminal Appeals' much-maligned *Burdine* decision in the criminal context and given the par-

ticular factual circumstances of this case, at the very least, we should accord it the attention of the full court.

For this reason, I respectfully dissent to the denial of *en banc* consideration.

En banc consideration was requested. *See* Tex.R.App. P. 41.2(c).

Chief Justice RADACK and Justices JENNINGS, KEYES, HANKS, HIGLEY, BLAND, SHARP, and MASSENGALE participated in the vote to determine en banc consideration.

A majority of the Court voted to deny en banc consideration. *See* Tex.R.App. P. 49.7.

Justice SHARP, dissenting from the denial of en banc consideration.

Justice ALCALA **recused** herself and did not participate.