**AFFIRM; and Opinion Filed July 24, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-12-00697-CR**

_____

**GABRIELLE ANTOINETTE LYNCH, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 366th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 366-80303-2012**

_____

## OPINION

Before Justices FitzGerald, Francis, and Lewis
Opinion by Justice Lewis

The trial court found appellant Gabrielle Antoinette Lynch guilty of two counts of endangering a child and assessed her punishment at two years' confinement for each offense. Lynch raises a single issue in this Court, contending the trial court committed reversible error when it denied her motion for directed verdict at the conclusion of the State's case-in-chief. We affirm the trial court's judgment.

**Background**

A.P., the son of Lynch and her boyfriend Akeem Parrilla, was born on January 13, 2011. When he was seven weeks old, Lynch and Parrilla brought A.P. to the emergency room at Texas Health Presbyterian Plano Hospital with concerns about his right leg. The parents told hospital personnel that when Lynch was doing stretching exercises with the infant, his right leg moved abnormally up toward his chest. An x-ray showed A.P.'s femur was broken, and subsequent

treatment led to the discovery of many more injuries. Following an investigation, the police arrested both parents. Initially, both were charged with nine counts of injury to a child. Lynch's indictment was later amended to add the two counts of endangerment. She and Parrilla were tried together before the court.[1]

Plano Presbyterian emergency room physician Brad Sellers testified that the x-ray of A.P.'s leg indicated his femur was fractured transversely mid-shaft, i.e., straight across the bone. The x-ray alerted Sellers to the possibility of abuse because, given the significant force necessary to break a femur, such a fracture is not typically an accidental injury. Sellers believed the injury probably occurred some three or four hours before A.P. was brought to the hospital. A.P. was transferred that same evening to Children's Medical Center ("Children's") for specialized pediatric treatment and investigation as a suspected child abuse case.

At Children's, A.P. was treated by specialists in pediatric child abuse, and the full extent of his injuries was discovered. The infant had suffered thirty-six fractures. Dr. Amy Barton catalogued these skeletal injuries:

> The observed injuries included a total of 36 broken bones, this included broken rib bones, we had a total of 27 broken ribs it looks like. He also had a broken right femur bone. He also had breaks in his right tibia, which is one of the bones in the lower leg. And then also his right radius, which is a bone in the upper arm – or in the arm on the lower part of the arm connecting into the hand, the left ulna, which is also another arm bone that connects in the hand, the left humerus, which is the big bone in the upper arm, the left radius, the left femur and his left tibia.

Barton also identified bruising around the front of A.P.'s neck, on his abdomen, and on the back of his left thigh. Finally, A.P. had fluid in his lungs, which Barton said was a typical response to trauma.

---

[1] Although the details of a termination proceeding are not in our record, there was testimony that both parents' rights had been terminated at the time of trial, and the child was being adopted by Lynch's father and stepmother.

Barton testified as to the different types of fracture A.P. had suffered and explained how each type was caused. The fracture that brought A.P. to the emergency room was a break directly across his femur; the bone was actually broken apart. Barton testified this was a fracture that tends to result from direct blunt force impact to the leg. She explained that both femurs, the right radius, and the right tibia contained metaphyseal fractures, which are the result of rapid back and forth movement of the limb, i.e., twisting or shaking. The rib fractures were caused by squeezing, and that damage to the ribcage could have caused the fluid on A.P.'s lungs. Injuries on the left side of A.P.'s body—his left tibia, left ulna, and left humerus—involved buckle fractures, which result from impact to the extremity (i.e., the foot, hand, or elbow) that is so sharp, the force goes up the bone and causes it to buckle on itself.

Finally, Barton explained that x-rays of the broken bones give some indication of when the injuries occurred, based upon the presence of signs of healing. She was able to discern from the degree of healing that the rib fractures occurred more than fourteen days before the x-rays were taken. Both femur breaks, again based on the x-rays, were newer than seven to ten days before the x-rays were taken. Similarly, none of the arm and lower leg fractures showed signs of healing at the time of the x-rays. Thus, Barton concluded A.P. suffered at least two different assaults. She described A.P.'s injuries as serious bodily injury and said they could not have been inflicted accidentally. Indeed, she testified that whoever caused these injuries would have known that they were creating pain and distress for this child, and it would have been obvious that he was in pain. As to how the injuries might have been inflicted, Barton testified that A.P.'s injuries are similar to cases she had in the past in which a perpetrator confessed to shaking and then throwing the child.

Lynch and Parrilla were interviewed by an investigator from Child Protective Services, Marisa Ballew, and by Plano police detective Chris Jones, who was assigned to investigate child

abuse cases. Lynch denied that she or Parrilla ever hurt A.P. Lynch stated she was A.P.'s primary caregiver. Both parents were unemployed and around the house at the time, but Lynch told Jones that even when Parrilla was taking care of A.P., she was still there because she "never [went] anywhere."

When asked who could have injured A.P., Lynch told investigators that friends had been at their home the day they brought A.P. to the emergency room, and that she and Parrilla had left for about fifteen minutes to pick up food. However, one of the friends she identified as having been alone with A.P. that day, Chamara Ingram, testified that she had never been to Lynch's home and had never seen the new baby. Ingram also testified that before Lynch was arrested, Lynch contacted her and asked her to lie and tell police that she—Ingram—had caused the injury. Ingram refused. Ingram also refused Lynch's request to contact Jatasha Thomas, another friend, and ask Thomas to take responsibility for A.P.'s injury. Lynch had also told investigators that Thomas was among the friends at her home with A.P., but Ingram confirmed that Thomas had not visited Lynch's home either.

When asked about other people who might have babysat for A.P., Lynch identified only her father and stepmother. But, according to Lynch herself, A.P. had not stayed with them for three or four weeks before he was hospitalized.

Lynch and Parrilla were both in jail while they awaited trial. The two exchanged a number of letters, and portions of those letters were admitted into evidence at trial. Lynch wrote to Parrilla, and to others, concerning the extensive physical abuse she had suffered at Parrilla's hands over the course of their relationship. She chronicled a history of arguments in which Parrilla's blows left her with black eyes, but each time she would forgive Parrilla and stay with him. Then she described the events of an evening when Parrilla believed Lynch was "showing out" in front of his niece:

–4–

I got choked so bad that I thought I was going to die and you drove me in the dark to punch me and give me body blows and bit [sic] me in the face and pulled my hair and all of that. For what? This is the man I loved. So why [do] I still take him back? Cause I loved you.

At least once, Lynch referred to herself in a letter as a "battered woman." And at least once, she conceded she chose Parrilla over her family when relatives expressed concern for her well-being.

Lynch's mother, Quintana James, also testified at trial. She described an occasion when she took Lynch to the hospital for treatment after Parrilla choked her. Parrilla came to James's home after that incident and pulled a gun on her, saying: "I came over here to shoot somebody."

The trial court found Parrilla guilty of nine counts of injury to a child. It found Lynch not guilty of injury to a child, but guilty of both endangerment counts. Her punishment was assessed at two years' confinement for each count. This is Lynch's appeal.

## Endangering a Child

In this Court, Lynch contends the trial court erred by overruling her motion for directed verdict. A challenge to the denial of a motion for a directed verdict is essentially a challenge to the legal sufficiency of the evidence. *Rice v. State*, 195 S.W.3d 876, 879 (Tex. App.—Dallas 2006, pet. ref'd). We determine whether the evidence is legally sufficient to support a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012). We defer to the fact finder to resolve any conflicts in testimony and to weigh the evidence and draw reasonable inferences from it. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

A person commits the offense of endangering a child if she "intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." TEX. PENAL CODE ANN. § 22.041(c) (West 2011). The specific conduct charged

–5–

by Lynch's indictment was that she (1) allowed A.P. to be in Parrilla's presence, and (2) allowed A.P. to be in Parrilla's presence without supervision. Lynch argues in this Court that there is no evidence she placed A.P. in imminent danger merely by leaving him with his father, whether with or without supervision. However, in cases involving injury to a child, there is rarely direct evidence of exactly how the child's injuries occurred. *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). We look instead to rational inferences from circumstantial evidence to determine whether the State carried its burden. *See id.* And, again, we view the evidence in the light most favorable to the prosecution. *Johnson*, 364 S.W.3d at 293–94.[2]

In this case, Lynch represented that she was A.P.'s primary caregiver, and that she was always present when Parrilla was taking care of him. She told investigators that her father and step-mother babysat for A.P. more than once, but that A.P. had not stayed with them for three or four weeks before A.P.'s hospitalization. Thus, her parents could not have been responsible for any of the injuries to A.P.'s arms and legs. Lynch also told investigators that a group of friends had briefly been alone with A.P. the day of the hospitalization. That report was contradicted by Ingram's testimony. But even if other friends had been there that day, they could not have been responsible for the injuries to A.P.'s ribs, which had already shown signs of healing. Jones testified that he did not believe Lynch's story concerning what happened to A.P. because—given that the injuries had occurred in at least two separate incidents—he found it unlikely that different people outside the home would have caused severe injuries on two different occasions. We conclude a rational fact finder could also conclude that A.P. was not injured by these

---

[2] Accordingly we do not dwell on Lynch's argument that A.P. was examined by two doctors who did not discover any injuries to the child. Viewing the evidence in the light most favorable to the prosecution, we conclude the earlier rib injuries could have occurred after the second examination, which took place almost four weeks before the Children's x-rays.

unrelated sets of people on entirely different occasions. Instead, a rational fact finder could conclude A.P. was injured in his home by one of his primary caregivers.

Lynch insisted she was always present, even when Parrilla was taking care of A.P. Barton testified that the person who injured A.P. would have known he was hurting the child and it would have been obvious that the child was in pain. If Parrilla injured A.P., and Lynch was present, a rational fact finder could have concluded that Lynch was aware of the abusive conduct. Lynch certainly knew of the risk of violent conduct by Parrilla. Her own history with him, as well as her mother's, established that fact. *Cf. Walker v. Tex. Dept. of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child.").

The evidence is undisputed that A.P. sustained injuries on at least two occasions. The evidence suggests Lynch was present and aware of the first injury. Even if she had been unsure of the danger of allowing A.P. to remain with Parrilla beforehand, a rational fact finder could have concluded Lynch knew that A.P. was in imminent danger once Parrilla fractured the infant's ribs. But Lynch did not remove A.P. from his father's presence to a safe location. Instead, she allowed the infant to remain where—on one or more occasions—his father could inflict even greater injuries. And after this further abuse, Lynch still did not acknowledge the threat Parrilla posed to A.P. Instead, it appears she assisted in fabricating a story concerning A.P.'s severely broken leg and attempted to persuade friends to lie to the police in support of that story. Again, a rational fact finder could have concluded that one of the parents created this story to conceal the truth about A.P.'s injuries: either it was Lynch's own idea, or she went along with Parrilla's.

We conclude the evidence is sufficient to support the trial court's finding that Lynch placed A.P. in imminent danger by leaving him with Parrilla, with or without supervision. Accordingly, we conclude the trial court did not err in overruling Lynch's motion for directed verdict, *Johnson*, 364 S.W.3d at 293–94, and we overrule Lynch's sole issue.

## Conclusion

We have decided Lynch's issue against her.  We affirm the trial court's judgment.

/David Lewis/
DAVID LEWIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120697F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GABRIELLE ANTOINETTE LYNCH,
Appellant

No. 05-12-00697-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 366-80303-2012.
Opinion delivered by Justice Lewis.
Justices FitzGerald and Francis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 24th day of July, 2014.

/David Lewis/

DAVID LEWIS
JUSTICE