**Opinion issued August 31, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00193-CV

————————————

## IN THE INTEREST OF A.D.N., A CHILD

———

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-00520J**

———

## MEMORANDUM OPINION

This is an appeal from a decree terminating a mother's parental rights. The mother contends that the evidence was legally and factually insufficient to support the termination of her parental rights. Because the evidence is sufficient to support the trial court's decree, we affirm.

**Background**

Appellant's daughter, A.D.N., who is the subject of this parental-termination proceeding, was born in the spring of 2012. From infancy the child lived with her maternal grandmother and her step-grandfather. In May 2016, the Department of Family and Protective Services received a referral regarding the child. According to the Department's removal affidavit, the referral source stated that A.D.N. lived with her grandparents because appellant had a "drug problem" and had been unable to provide a stable home environment for her daughter. According to the affidavit's description of the referral allegations, appellant visited A.D.N. at the grandmother's home and sometimes spent the night there. In May 2016, however, for the first time, appellant tried to remove A.D.N. from the grandmother's home.

The referral alleged that appellant had shown up "high" at the grandmother's home several days in a row at 4:00 a.m., and she caused disturbances there. It was reported that appellant then attempted, unsuccessfully, to remove A.D.N. from school. Later, accompanied by law enforcement officers, appellant went to the grandmother's home and demanded that A.D.N. be given to her. Although the grandmother had temporary custody of the child, and she informed the police that appellant did not have a home and was in possession of drugs, appellant was permitted to take A.D.N.

The removal affidavit further reported that appellant then "got high on bars" and left A.D.N. with a friend while she went out for the night. The friend contacted the grandmother, who retrieved A.D.N. and took her home. It was further alleged that appellant had a history of leaving A.D.N. with friends, but without necessary supplies to care for the child. When A.D.N. was a few weeks old, appellant allegedly left her with a friend and did not return for two weeks.

The Department conducted an investigation, and approximately nine months after receiving the referral it filed a petition seeking temporary managing conservatorship of A.D.N. and termination of parental rights if reunification with the parents was found to be unsuitable. According to the removal affidavit, appellant initially had agreed to complete services for substance abuse intervention and parenting. She later insisted that she would not participate in any services, and she told a caseworker she would change her telephone number if the Department tried to contact her again. After a full adversary hearing, A.D.N. was placed under the Department's care, and the placement with her grandparents was continued during the suit.

The Department developed a family service plan for appellant which the trial court incorporated by reference in a status-hearing order, making the plan an order of the court. The plan listed several tasks and services to be completed for reunification with A.D.N. to occur. The plan stated that it was intended to help

3

appellant provide a safe environment for A.D.N. within a specified time, and that if she was unwilling or unable to provide that safe environment, parental and custodial duties and rights could be restricted or terminated, or the child might not be returned. The trial court further prohibited appellant from having visits with A.D.N. until she tested negative for drugs. In a subsequent order, the trial court ordered appellant to pay minimum-wage child support.

The Department's petition to terminate parental rights was tried to the bench in January 2018. Exhibits admitted into evidence included, among other documents, family-service plans (including a summary of the referral received by the Department as the "reason for child protective services involvement"), the removal affidavit, a Children's Crisis Care Center family evaluation, the Department's final permanency report to the court, results of several drug tests for both parents, and documentation related to the criminal history of both parents.

T. Summerville was assigned as the caseworker during the suit, and the Department called her as its sole witness at trial. Appellant testified, and she also called the Child Advocates representative as a witness. A.D.N.'s caregivers, her maternal grandmother and step-grandfather, were present in court, but they did not testify.

The caseworker testified that A.D.N. was removed from appellant's care in May 2016. Appellant repeatedly tried to take A.D.N. from the grandmother, and the

4

child was then removed from the grandmother's home by police. The caseworker explained that appellant then left A.D.N. with a friend, and the grandmother had to pick up the child. She stated that appellant had completed most of the services ordered in her family service plan. Due to Hurricane Harvey, appellant had been delayed in beginning her individual counseling, and she had one session remaining. Appellant was paying court-ordered child support for A.D.N. She told the caseworker she was living with an uncle, and she provided an address. Appellant also provided the caseworker with contact information for her employer, by whom she was paid in cash. However, the caseworker was unable to verify appellant's employment.

The caseworker testified that appellant had tested positive for drugs several times throughout the case. Appellant failed to appear for a court-ordered drug test in February 2017, though she had not yet been served with the petition at that point. Appellant failed to appear for a court-ordered test in April 2017. She gave birth to her son, R.R., the day after she had been required to appear. At the time of trial, there was another pending conservatorship case involving R.R.

The drug test results admitted into evidence showed that appellant tested positive for cocaine based on hair follicle testing in May 2016, March 2017, and June 2017. She tested positive for marijuana based on hair follicle testing in March, June, July, and October 2017. The June 2017 test also was positive for

5

benzoylecgonine, a primary metabolite of cocaine, and marijuana metabolites. The July test was positive for marijuana metabolites. Appellant also tested positive, based on a urinalysis in July 2017, for hydrocodone and hydromorphone. The caseworker considered appellant's drug use to be "endangering conduct." She stated that the result of the October 2017 test, which was positive for marijuana, showed only exposure to the drug, and not ingestion. Nevertheless, she believed that appellant's exposure to that much marijuana was "not a positive thing."

Results of subsequent hair follicle and urinalysis tests were negative for drugs, and appellant contacted the caseworker to arrange visits with A.D.N. The caseworker testified that she understood the court order to mean that visits could be "considered" once appellant tested negative for drugs. She stated that she and A.D.N.'s attorney ad litem "did not agree with the visitations," so they denied appellant's request.

Records of appellant's criminal history showed that she was convicted of felony theft in 2011 and misdemeanor theft in 2012. In 2014, she was convicted of a misdemeanor after a car accident in which she failed to stop and give her information to the other driver. Later that year, she was convicted of misdemeanor possession of alprazolam, a controlled substance. She was sentenced to ten days in jail. The caseworker considered appellant's criminal conduct and convictions to be "endangering conduct."

The caseworker believed it would be in the best interest of A.D.N. for both of her parents' rights to be terminated, and for the child to be adopted by her maternal grandmother. She explained that A.D.N. had been living with her grandmother since she was an infant, and it was the only home she knew. A.D.N. had a great relationship with the grandmother and step-grandfather, and with her teenage uncle who also lived in the home. She called her grandmother "Mommy." The caseworker stated that A.D.N. was doing very well in school, and she was involved in several extra-curricular activities. The grandmother's home provided a safe and stable environment for A.D.N., and there were no issues of drugs or criminality in the home.

K. Neal of Child Advocates, A.D.N.'s court-appointed volunteer guardian ad litem, also testified. Neal testified that A.D.N. was in a "great" placement with her grandmother, and the home provided a "loving" and "stable" environment for the child. A.D.N. was doing "very, very well." A.D.N.'s brother, R.R., had been placed with caregivers in the same neighborhood, which Neal agreed would be convenient for future visits between the siblings.

However, Neal had filed a report with the trial court recommending that the trial be continued. She explained that appellant had completed all of her services, and her last two drug tests prior to trial had been negative. Neal additionally testified that A.D.N. "loves her mother," and she spoke "very highly" of appellant during her

visits with the child. Nevertheless, Neal did not ask the court to place A.D.N. with appellant. Rather, she testified that Child Advocates believed it would be in A.D.N.'s best interest to remain with her grandparents while appellant continued to address her substance-abuse issues. Neal recommended that appellant have weekly visits with A.D.N., supervised by the grandmother, while the case was continued.

Appellant also testified. Other than one final therapy session scheduled for the day after trial, she had completed her family-service plan. She produced a certificate that showed she had completed eight weeks of parenting classes. She also produced a certificate of completion for four months of outpatient treatment for substance abuse, dated August 2017. Both certificates were admitted into evidence. Appellant testified that she was seeing an aftercare counselor for drug abuse, and she intended to continue treatment with the counselor.

Appellant conceded that she had started using drugs in high school. She explained that she "made a mistake." She initially testified that she had not used drugs since July 2016. However, during cross-examination, she stated that she was confused about the date, and she clarified that she had been sober since July 2017. She stated that the July 2017 test had been positive for hydrocodone because she had prescriptions for hydrocodone and oxycodone to treat pain stemming from a 2015 car accident. She stated that she no longer used the medications. Appellant was aware that relapse rates for drug abusers are very high, and she understood that

having a sponsor and attending support meetings was important to maintaining sobriety.

At the time of trial, appellant was living with her uncle, and she testified that his house was an appropriate place for A.D.N. to visit. She described her uncle as being "like a father figure" to her, and she stated that she had not been in any arguments with him. She further stated that she could rely on him if she needed financial help. Appellant conceded that her uncle could ask her to leave his house at any time. She stated that she would get a place of her own if he did ask her to leave.

Appellant testified that she had a job selling air conditioners, and she was paid in cash. She had purchased a car for $1,500, and she had saved an additional $5,000. She also had applied for disability benefits, but she had not yet been approved. Appellant agreed that she was getting paid in cash for her sales job because she did not want the income to negatively affect her pending disability claim or a pending lawsuit. While the case was pending, appellant had paid $900 in child support for A.D.N., and she was current on her payments. She had also purchased clothing and shoes for A.D.N. in the past. Appellant testified that she was "not sure" how much the grandmother spent each month to take care of A.D.N.

Appellant wanted the court to deny the petition to terminate her parental rights with respect to A.D.N. She wanted "more time" in this case because she was "still fighting" the case to maintain her parental rights to her son. A.D.N. had lived at the

grandmother's house "since she was about two," and appellant also had lived there with her for a period of time. Appellant believed that her own mother, A.D.N.'s grandmother, did not believe she was trustworthy because when she lived there in the past she "was messing up." She testified, however, that she had learned to "be specific and . . . responsible" and "not to do drugs." She stated that she would ensure that A.D.N. would not be in "harm's way."

Appellant stated that she did not want the grandmother to adopt A.D.N. However, she also testified that she did not "have a problem" with it. Appellant agreed that the grandparents did a "great job" parenting A.D.N. Despite testifying that she did not want A.D.N. to be adopted by her grandmother, appellant also affirmatively testified that it would be in the best interest of the child.

In its final order, the trial court found that appellant had committed predicate acts of endangerment. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). The court also found that termination of appellant's parental rights was in the best interest of A.D.N. Based upon those findings, the trial court terminated appellant's rights to A.D.N. The trial court also terminated the parental rights of A.D.N.'s alleged father and the "unknown father." The Department was named sole managing conservator of the child.

**Analysis**

On appeal, appellant challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights under sections 161.001(b)(1)(D) and (E). She also argues that the evidence was legally and factually insufficient to support the finding that termination of her parental rights was in A.D.N.'s best interest.

To terminate parental rights, the State must establish by clear-and-convincing evidence that there is at least one predicate statutory ground for termination and that the termination is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b); *see also In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). Clear-and-convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

To assess legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. We assume that any disputed facts were resolved in favor of the finding as long as a reasonable factfinder could have done so. *Id.* If "no reasonable factfinder could form a firm belief or conviction" that the matter on which the State bears the burden of proof is true, then we "must conclude that the evidence

11

is legally insufficient." *Id*. In reviewing the factual sufficiency of the evidence, we consider the entire record, including disputed evidence. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## I.     Endangerment

The Department sought termination of appellant's parental rights on grounds of endangerment. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). Only one predicate finding under section 161.001(b)(1) is required to support a judgment of termination when there is also a finding that termination is in the best interest of the child. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

The predicate act of endangerment under paragraph (E) is satisfied if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). A child's well-being is "endangered" by exposure to loss or injury or when her emotional or physical health is put in jeopardy. *Tex. Dept. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the endangering conduct be directed at the child or that the child

12

actually suffer injury. *Id.* To determine whether termination is justified, courts may consider conduct that did not occur in the child's presence and conduct that occurred before and after the child was removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Courts also may look to conduct that occurred before the child's birth. *Id.*; *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

A "parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *J.O.A.*, 283 S.W.3d at 345. A parent's use of illegal drugs may support termination under section 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. Further, "a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *10 (Tex. App.—Houston [1 Dist.] 2014, no pet.) (mem. op.).

The referral alleged that appellant showed up "high" at the grandmother's house and took A.D.N. It also alleged that appellant continued to use drugs that evening before leaving the child with a friend. Appellant's criminal records showed that she was convicted for criminal possession of a controlled substance and

sentenced to 10 days in jail. Thus, the evidence supported a conclusion that appellant's illegal drug use prior to the initiation of this suit resulted in risks of impairment and imprisonment. *See Walker*, 312 S.W.3d at 617. After the suit was initiated in February 2017, appellant continued to test positive for drugs. She tested positive for cocaine in March and June 2017. She tested positive for marijuana in March, June, and July 2017. Additionally, the result of a urinalysis, also from July 2017, was positive for hydrocodone and hydromorphone. Appellant testified that she had last used drugs in July 2017. However, evidence that appellant engaged in illegal drug use while the termination suit was pending, despite knowing that she was at risk of losing her rights to A.D.N., supported a conclusion that she engaged in conduct that endangered the well-being of her child. *See J.O.A.*, 283 S.W.3d at 345. Thus, the evidence was legally sufficient to support a finding of endangerment.

According to appellant's own testimony she stopped using drugs in July 2017, five months after the suit was initiated. With respect to the positive results for hydrocodone and hydromorphone, appellant claimed to have valid prescriptions for the drugs. However, she failed to produce any evidence to support that claim, and there was evidence that she had a history of abusing prescription drugs. There was no evidence to contradict the Department's proof that appellant used illegal drugs while the suit was pending. Considering the entire record, we hold that the evidence also was factually sufficient to support the trial court's finding.

Because we have found that the evidence is both legally and factually sufficient to support the predicate finding of endangerment under subsection (E), we need not address the sufficiency of the evidence to support a finding under subsection (D). *See A.V.*, 113 S.W.3d at 362; *L.M.*, 104 S.W.3d at 647. Accordingly, we overrule appellant's first issue.

## II. Best interest of the child

There is a strong presumption that the best interests of a child are served by maintaining the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). To determine whether termination of the parent-child relationship was in the child's best, we evaluate the evidence in light of the factors set out in *Holley v. Adams*: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). The list of *Holley* factors is not exhaustive, nor is evidence of all nine factors required to support a judgment of termination. *Id.* at 372.

15

Evidence that establishes the predicate acts under section 161.001(b)(1) may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 27–28.

*Desires and needs of the child.*—A.D.N. was five years old at the time of trial. She did not testify. The child advocate testified that A.D.N. cared for appellant, but the child had lived with her grandparents most of her life. The evidence established that A.D.N. had a strong bond and a good relationship with her grandparents and with her uncle, who also lived in the home. A.D.N. was doing well in school, and she participated in extra-curricular activities. In her appellate brief, appellant concedes that the child's "desire, presumably, would be to continue living with and being raised by these maternal relatives."

*Endangerment of the child.*—In determining the best interest of a child, a factfinder may consider evidence of a parent's past behavior that endangered the well-being of the child and infer that the conduct may recur in the future if the child is returned to the parent. *See, e.g.*, *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Appellant's illegal drug use prior to the initiation of this suit resulted in impairment and imprisonment, and it supported a conclusion that she engaged in conduct that endangered A.D.N.'s well-being.

Appellant contends that she completed her family-service plan in an attempt to learn how to protect her child going forward. At trial, she testified that she had learned to be "responsible," and "not to do drugs." Appellant's final two drug tests

prior to trial were negative for the presence of drugs. However, it was undisputed that appellant continued to use illegal drugs while the case was pending. A parent's drug use can support a finding that termination is in the best interest of a child. *See, e.g.*, *C.H.*, 89 S.W.3d at 28; *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

The caseworker testified that there were no issues of drugs or criminality in the grandmother's home.

***Programs available to promote the best interest of the child.***—The evidence established that appellant took advantage of the services and programs offered in her family-service plan. There was no evidence about programs available to the grandparents, nor was there evidence of any need for them.

***Parental abilities, plans for the child, and stability of home.***—Appellant completed her family-service plan, including an 8-week parenting class. She testified that she had learned to be "specific," "responsible," and "not to do drugs." However, as discussed above, the evidence established that appellant did use illegal drugs while the case was pending, including while she was in an outpatient substance-abuse treatment program, and while she was pregnant with R.R.

Appellant testified that she was living with her uncle, and that his house was an appropriate place for A.D.N. to visit. The caseworker stated that appellant had provided her an address for the uncle, but there was no further evidence about

17

whether it was a stable or safe environment for a child. There was no evidence from the uncle that he would permit A.D.N. to live at his home. Further, there was no evidence that appellant paid rent to her uncle or that she had a lease. It was undisputed that appellant could be asked to leave her uncle's home at any time.

Appellant testified that she had a job selling "AC units," and that she was paid in cash. She stated that she had purchased her own car, and she also had saved several thousand dollars, which she would use to get her own home if necessary. However, appellant did not provide documentation to establish that she was employed or to establish the amount of her income, and the caseworker testified that she was unable to verify appellant's employment. The Child Advocates representative stated that she had spoken to appellant's manager over the phone, but she never met him. Appellant had filed a disability claim, which had not yet been approved. Her testimony implied that information about her income could jeopardize her eligibility or ability to receive disability benefits. Additionally, when asked to estimate how much the grandmother spent to take care of A.D.N. on a monthly basis, appellant responded that she did not know.

In contrast, it was undisputed that A.D.N.'s grandparents provided a loving, stable, and safe environment for the child. The maternal grandmother planned to adopt A.D.N.

*    *    *

The Department sought termination of the parental rights of A.D.N.'s parents so that the child could achieve permanency through adoption by her maternal grandmother. The guardian ad litem believed it was in A.D.N.'s best interest to remain with the grandparents, although she also advocated to continue the trial based on appellant's progress. Appellant herself testified that it would be in A.D.N.'s best interest to be adopted by her grandmother.

Considering the *Holley* factors and reviewing all of the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of appellant's parental rights was in the best interest of A.D.N. Moreover, none of the disputed evidence was so significant that the factfinder could not have formed such a firm belief or conviction. We therefore conclude that the evidence was both legally and factually sufficient to support termination of appellant's parental rights to A.D.N.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Keyes, Bland, and Massengale.