**Opinion issued February 27, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00675-CV

———————————

## IN THE INTEREST OF A.D., A CHILD

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-01625J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a suit brought by the Texas Department of Family and Protective Services ("DFPS") to terminate a parent-child relationship.

After a bench trial, the trial court terminated the parental rights of M.D. ("Father") to his minor child, "Ava."[1] The trial court's Decree for Termination is

---

[1] Pursuant to the Texas Rules of Appellate Procedure, we use an alias to refer to the child and to her parents. *See* TEX. R. APP. P. 9.8(b)(2) (providing that, in parental-

based on its findings under subsections 161.001(b)(1)(E), (N), and (O) of the Texas Family Code and that termination of the parent-child relationship is in Ava's best interest. The trial court also appointed DFPS as sole managing conservator of Ava.

Father now challenges the trial court's decision.[2] In five issues, Father contends that the evidence is legally and factually insufficient to support the trial court's findings that he engaged in the predicate acts detailed in subsections 161.001(b)(1)(E), (N), and (O) and that termination of his parental rights is in Ava's best interest. Father also argues that the trial court abused its discretion in appointing DFPS as Ava's sole managing conservator.

We affirm.

## Background

Ava was born on July 3, 2023. Just four days after her birth, DFPS filed a petition for the protection of Ava, seeking managing conservatorship over Ava, and for termination of Father's and Mother's parental rights.[3]

---

rights termination cases, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member"). In its brief, DFPS refers to the child as "Ava."

[2] *See* TEX. FAM. CODE § 263.405(a); TEX. R. APP. P. 28.4.

[3] Although the trial court ultimately terminated Mother's parental rights to Ava, Mother did not appeal the trial court's decree of termination and she is not a party to this appeal.

DFPS Investigator T. Hairston testified that DFPS received a report that Ava had tested positive for cocaine in the meconium. Hairston spoke with Mother at the hospital as part of his initial investigation. Mother told Hairston that she had a history of past drug use, including cocaine. Although Mother claimed that she had completed a rehabilitation program and had been clean for six weeks, Hairston testified that she tested positive for cocaine in a drug test administered by DFPS.

Hairston learned during his investigation that Father and Mother appeared to be living together at the time of Ava's birth. And they had three other children together, in addition to Ava, and that both Father's and Mother's parental rights had been terminated with respect to those three children. Additionally, Hairston learned that Mother tested positive for cocaine in the hospital following the births of her three other children.

Hairston also interviewed Father during his investigation at the hospital. Father admitted to using cocaine. And both parents disclosed extensive prior CPS history. While Hairston was interviewing Father, Father was concerned about another child of his who had been previously removed from the home by DFPS. When Hairston could not provide Father with any information about that child, Father became aggressive and was escorted out of the hospital by security.

Based on the above, Hairston testified that DFPS made the decision to seek removal of Ava and to be appointed temporary managing conservator. DFPS was

3

subsequently appointed as Ava's temporary managing conservator, and she was placed in a foster home.

Hairston also testified that he supervised two visits between Father and Ava after her removal. The first occurred on July 17, two weeks after Eva was born. Hairston testified that Father was attentive and caring towards Ava. The second occurred a week later, on July 24. Hairston testified that Father "seemed to be unsure [of] what he was doing" and that Father appeared to be concerned that Ava might not be his child.

Caseworker N. Diop then testified that Ava is currently in a foster home—the same foster home she has been in since she was removed shortly after birth. Diop testified that Ava is doing well in her placement, and that she is happy and developmentally on track. Ava has been diagnosed with an unspecified heart murmur, but it is being monitored and is not currently causing her any issues. Diop also testified that the foster family is interested in adopting Ava and that Diop believes remaining in this placement is in Ava's best interest.

Diop further testified that Father completed an acknowledgement of paternity and has been established as Ava's father. And that Father is currently serving a two-year sentence in prison for burglary. Additionally, Father has an extensive criminal

4

history, dating back to 2003 or 2004, including numerous convictions for possession.[4]

In his family service plan (FSP), which was made an order of the court, Father was ordered to provide safe and stable housing, to provide proof of employment, to attend all meetings and court hearings, to submit to random drug testing, to complete a psychological background, and to attend parenting classes. Prior to his arrest, Father did not complete any of these services. Diop testified that although some of those services, namely parenting classes, are available to Father while he is in prison—he has not completed any of the parenting classes.

Diop testified that Father did submit to two court-ordered drug tests. He did not, however, agree to submit to drug tests separately as requested by DFPS. The results from the two court-ordered drug tests—both of which were positive for cocaine, among other drugs—were introduced into evidence, along with drug test results dating back to 2019.

Diop also testified that Father attended two visits with Ava, both in September, but that his (and Mother's) visitation rights were suspended in December 2023 due to "nonengagement" at the visits. She stated that Father never requested to have his visits reinstated.

---

[4]    DFPS introduced into evidence seven judgments of conviction for Father between 2004 and 2024.

5

Diop testified that Ava tested positive for cocaine at birth and that Ava's three older siblings also tested positive for cocaine at birth. She testified that DFPS's goal was initially reunification. But because both parents were not complying with their FSPs and were continuing to engage in endangering conduct, including drug usage and criminal activity, DFPS changed its goal to termination.

Father appeared at trial. He testified that he was arrested in November 2023 and is currently serving a two-year sentence for burglary. He expects to be released in November 2025.

Upon his release from prison, Father likely intends to leave Houston and stay with family in San Antonio. Father was honorably discharged from the military and is physically disabled. He receives monthly disability payments from the military, in the amount of $3,000, although those payments have been lowered to ten percent while he is in prison. Father expects that once he is released, those payments will resume at one hundred percent, and thus, he would be able to support himself financially.

Father testified that, upon his release, his plan for Ava is to be "the best [he] can for her, . . . make sure she has everything she needs, be there for her, make sure she has a safe and stable environment."

Father also testified that he visited with Ava "several times" before he was arrested and those visits went well. He would bring her clothes, feed her, change

her, and take pictures with her. Father requested that the trial court not terminate his parental rights to Ava because "it's time to step up."

On cross-examination, Father admitted that he has a criminal history dating back to around 2004. He also admitted to a history of cocaine use, which started around 2001, and occasionally used methamphetamines. And that he used drugs while living with Mother and that he and Mother used drugs together. Father additionally admitted that he knew of Mother's drug use before and during her pregnancy. And that his parental rights to his three other children were terminated due to his drug use history.

N. Epstein, a Child Advocate volunteer assigned to this case, testified that she had concerns about Father's sobriety. She testified that she did not believe that Father would be able to provide Ava with a safe and stable environment. She testified that Father's criminal history was also a concern for Child Advocates because it is "not a safe environment for the child and it's been reoccurring," and it frequently leaves him unable to parent his children. Accordingly, Child Advocates was recommending termination of Father's parental rights.

Epstein testified that she has visited with Ava on several occasions and she is thriving in her placement. Ava is bonded with her foster family and they provide her with a safe and stable environment. She also observed one visit between Father,

Mother, and Ava in September 2023. The parents were attentive to Ava and brought clothes for her and fed her.

According to Epstein, Ava has a few health issues, including a heart murmur and she went to an ophthalmologist who recommended that she wear a patch over one eye for a few hours a day. Ava's foster family has addressed all of her health issues. Additionally, Ava's foster parents have a biological child who also lives in the home, and Ava is bonded to that child. Ava has been included in their family events and has traveled with her foster family. Ava attends day care and is very well adjusted. She is developmentally on track, she interacts with other children, and she is very well taken care of. Epstein further testified that she believes it is in Ava's best interest to remain in her current placement.

Ava's foster father also testified. He stated that Ava lives with himself, his wife, and their seven-year-old daughter. And that Ava has lived with them since she was just a few days old. Ava is bonded with their family and they spend most of their time with her.

Ava's foster father testified that their immediate family lives close by and provides a good support system. He and his wife intend to adopt Ava if given the opportunity and they will continue to treat her as if she were their biological child. Ava is a part of their family, and they are able to, and do provide Ava with a safe and stable home.

8

In its Decree for Termination, the trial court found that termination of the parent-child relationship between Father and Ava is in Ava's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). It also found that Father engaged, or knowingly placed Ava with others who engaged, in conduct that endangered her physical or emotional well-being. *Id.* § 161.001(b)(1)(E). Additionally, the trial court found that Father constructively abandoned Ava, who had been in the permanent or temporary managing conservatorship of DFPS for not less than six months, that DFPS had made reasonable efforts to return Ava to Father, and that Father had not regularly visited or maintained significant contact with Ava and had demonstrated an inability to provide Ava with a safe environment. *See id.* § 161.001(b)(1)(N). Finally, the trial court found that Father failed to comply with a court order establishing the actions necessary for him to obtain Ava's return. *See id.* § 161.001(b)(1)(O). Thus, the trial court terminated Father's parental rights and appointed DFPS as Ava's sole managing conservator.

**Termination of Father's Parental Rights**

Father now argues on appeal that the evidence is legally and factually insufficient to support the trial court's findings. Namely, that he engaged in the predicate acts set forth in subsections 161.001(b)(1)(E), (N), and (O) of the Family Code and that termination of his parental rights was in Ava's best interest. *See id.* § 161.001(b)(1)(E), (N), (O), (b)(2).

9

## A.    Standard of Review

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted).  "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759.  "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (internal quotations omitted).  Thus, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute," "protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003).  Recognizing that a parent may forfeit his parental rights based on his actions or omissions—the primary focus of a termination suit is protection of the child's best interests. *Id.*

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (internal quotations omitted).  "[W]e look at all the evidence in the light most favorable to the

10

finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not, however, "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, the court should inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [ ] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**B.    Applicable Law**

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent

engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2).

Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his rights to another child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M). "[B]ecause prior termination for endangerment is a predicate ground for a future termination, due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704.

Here, the trial court found that Father:

(E)    engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [and]

....

(N)    [Father had] constructively abandoned the child who has been in the permanent or temporary managing conservatorship of [DFPS] for not less than six months, and:

    (i)    [DFPS had] made reasonable efforts to return the child to the parent;

    (ii)    [Father had] not regularly visited or maintained significant contact with the child; and

    (iii)    [Father had] demonstrated an inability to provide the child with a safe environment;

(O)    failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [DFPS] . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Because Father challenges the trial court's finding under subsection (E), thus implicating due process concerns, we must address that finding first. *See id.*

## C.    Section 161.001(b)(1)(E)

Section 161.001(b)(1)(E) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E).

13

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, . . . incarceration does support an endangerment finding 'if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child.'" *In re J.F.-G.*, 627 S.W.3d 312–13 (quoting *Boyd*, 727 S.W.2d at 533–34). Thus, our supreme court has held that "[a] parent's criminal history—taking into account the nature of the crimes, the duration

14

of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313.

Additionally, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. On this point, our supreme court has explained that endangerment does not require a parent's drug use to directly or physically harm the child. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). "Instead, a pattern of parental behavior that presents a substantial *risk* of harm to the child permits a factfinder to reasonably find endangerment." *Id.* (emphasis added).

"A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* Thus, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission . . . ." *Id.* at 831. A parent's conduct prior to the child's birth and either

before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring prior to the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.*

And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To support termination under subsection (E), it is not necessary to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

Here, DFPS presented evidence that Father repeatedly engaged in a course of criminal activity before Ava's birth that continued after her birth and during the pendency of this case. Specifically, the evidence reflects that between 2004 and 2007, Father was convicted four times of possession of a controlled substance, a state jail felony. Each time, Father received a sentence of between 180-185 days' confinement and a fine.[5]

---

[5] For the first offense, which occurred in 2003, Father initially was placed on deferred adjudication community supervision. But in 2004, the trial court adjudicated his guilt and assessed punishment at confinement for six months and a fine.

The evidence also includes a May 2010 judgment of conviction in which Father pleaded nolo contendere to the manufacture and delivery of a controlled substance, a state jail felony, for which he was sentenced as a repeat offender to four years' confinement and a $1,500 fine. Then, in May 2014, after pleading nolo contendere, Father was convicted of possession with intent to deliver a controlled substance, a first-degree felony, for which he was sentenced to ten years' confinement and a $2,000 fine.

Finally, four months after Ava's birth and during the pendency of this case, Father was arrested for burglary of a habitation. Father pleaded guilty and, as part of his plea bargain, the charge was reduced from a first-degree felony to a second-degree felony. Father was sentenced to two years' confinement in November 2023. And, at the time of trial, Father was incarcerated and serving his sentence for this conviction.

Father argues that the evidence does not demonstrate that he engaged in a pattern of increasingly serious crimes or that his crimes resulted in significant imprisonment. We disagree. Despite Father's assertions to the contrary, the above evidence reflects that Father did commit increasingly serious crimes—among them, possession of a controlled substance, possession with intent to deliver a controlled

17

substance, and burglary. The seriousness of these offenses, and their corresponding periods of imprisonment, plainly increased over time.[6]

And Father's criminal record shows a pattern of escalating conduct, continuing for a period of 20 years, not an isolated incident. Further, he did not stop engaging in criminal activity after Ava was born, "when he would (or should) have been aware that criminal conduct, like committing [burglary], risked separating him from [Ava] for years, as, in fact, it did." *See In re J.F.-G.*, 627 S.W.3d at 315. Thus, we conclude that "[t]he trial court could fairly consider these convictions—and their corresponding periods of imprisonment—under subsection (E)." *Id.*; *see also Walker*, 312 S.W.3d at 617 ("If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child.").

Father also argues there is no evidence that his alleged drug use endangered Ava because no evidence shows that Ava was exposed to or impacted by Father's drug use. Again, we disagree. Under the standard articulated in *R.R.A.*, the evidence in this case related to Father's drug use, when viewed in light of additional evidence demonstrating that Father's illegal drug use presents a risk to his ability to parent,

---

[6]     Although Father was most recently convicted of burglary, a second-degree felony, this was reduced from a first-degree felony as part of his plea bargain.

supports the trial court's termination finding under subsection (E). *See In re R.R.A.*, 687 S.W.3d at 278.

Specifically, the record shows that Father has a substantial history of drug use. He admitted that he began using drugs, specifically cocaine, in 2001. He testified that he and Mother used drugs together, and that he was aware that Mother used drugs both before and during her pregnancy. Father also testified that his parental rights to Ava's three older siblings were terminated in part due to his drug use.

The record also includes eleven positive drug tests for Father, between the dates of March 18, 2019, and September 14, 2023.[7] The last two, on July 21, 2023 and September 14, 2023, occurred during the pendency of this case. On July 21, less than three weeks after Ava was born and removal proceedings had begun, Father

---

[7]     On March 18, 2019, Father tested positive for benzoylecgonine and norcocaine. On May 7, 2019, Father tested positive for amphetamine, methamphetamine, benzoylecgonine, cocaine, and norcocaine. On July 15, 2019, Father tested positive for amphetamine, methamphetamine, benzoylecgonine, marijuana, and norcocaine. On July 30, 2019, Father tested positive for cocaine metabolites. On August 9, 2019, Father tested positive for methamphetamine, benzoylecgonine, and norcocaine. On September 13, 2019, Father tested positive for benzoylecgonine and cocaine. On October 9, 2019, Father tested positive for methamphetamine, benzoylecgonine, cocaine, and norcocaine. On November 11, 2019, Father tested positive for benzoylecgonine, cocaine, and norcocaine. On May 19, 2022, Father tested positive for cocaine and marijuana. On July 21, 2023, Father tested positive for benzoylecgonine, cocaine, and norcocaine. On September 14, 2023, Father tested positive for methamphetamine, benzoylecgonine, cocaine, norcocaine, and phencyclidine (PCP).

The record also reflects that Father tested negative on three dates—August 27, 2019, October 31, 2019, and January 13, 2020.

tested positive for benzoylecgonine, cocaine, and norcocaine. Two months later, on September 14, Father tested positive for methamphetamine, benzoylecgonine, cocaine, norcocaine, and phencyclidine (PCP).

Thus, the evidence in this record supports a finding that Father continued to use drugs despite the knowledge that his parental rights were subject to termination. *See In re J.O.A.*, 283 S.W.3d at 346 (listing father's use of marijuana "shortly before the final hearing" as evidence in favor of termination); *In re N.J.H.*, 575 S.W.3d at 831–32.

Furthermore, Father attended at most four visits with Ava—two in July and two in September 2023—before his visitation rights were terminated in December due to "nonengagement."[8]  Father never requested to have his visitation rights reinstated. And shortly before his visitation rights were terminated, Father was convicted of burglary.

Prior to his incarceration, Father failed to begin or complete any of the services in his FSP. Thus, Father's continued drug use throughout the pendency of this case coincides with his disengagement from services and from Ava, which poses a substantial risk to Ava's well-being. *See In re R.R.A.*, 687 S.W.3d at 281 (holding

---

[8]     The record is not entirely clear on the number of Father's visits with Ava. But it appears that he had two visits with Ava in July 2023, which were supervised by Hairston. And after the case was transferred to a conservatorship caseworker once DFPS was appointed as managing conservator of Ava, it appears he had two additional visits in September 2023.

20

legally sufficient evidence supported trial court's determination that father endangered children under (D) and (E) because father's refusal to submit to drug tests coincided with his disengagement from communications, services, and children themselves); *see also In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (holding legally sufficient evidence supported termination of parents' parental rights on endangerment grounds where evidence demonstrated parents used drugs together during mother's pregnancy, did not complete court-ordered services, including drug testing and refraining from drug use, sporadically attended visitation with their child, and continued drug use during pendency of case).

Accordingly, based on all of the evidence detailed above, the trial court could have reasonably concluded that Father's history of illegal drug use and criminal conduct, both of which continued during the pendency of this case, constituted a course of conduct that endangered Ava's physical and emotional well-being.

In sum, after reviewing the evidence in the light most favorable to the trial court's finding, as we must, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Father engaged in a course of conduct that endangered Ava. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *see also In re J.F.C.*, 96 S.W.3d at 266. Further, considering the entire record, including evidence both supporting and contradicting the finding, we conclude that the contrary evidence is

21

not so overwhelming as to undermine the trial court's firm conviction that Father's conduct endangered Ava. *See In re J.F.C.*, 96 S.W.3d at 266.

We therefore hold that the above evidence, including the evidence of Father's continued drug use and criminal conduct both before and during the pendency of this case, demonstrates a pattern of continued substantial risk of harm to Ava that is legally and factually sufficient to support the trial court's finding of endangerment under subsection (E). *See In re R.R.A.*, 687 S.W.3d at 281; *In re J.F.-G.*, 627 S.W.3d at 317.

We overrule Father's first issue.[9]

## D.     Best Interest of the Child

In his fourth issue, Father asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Ava's best interest.

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several non-exclusive factors, the "*Holley* factors," including: (1) the child's emotional and physical needs; (2) present and future

---

[9]     Because the evidence support's termination of Father's parental rights under subsection 161.001(b)(1)(E), we do not separately address Father's second and third issues challenging the trial court's other predicate grounds for termination. *See In re N.G.*, 577 S.W.3d 230, 237 & n.1 (Tex. 2019); TEX. R. APP. P. 47.1.

emotional and physical danger to the child; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set forth in section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29.

It is not necessary that DFPS prove all of these factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. Accordingly, the absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in a child's best interest. *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Based on these standards, several factors support the trial court's finding here that termination of Father's parental rights is in Ava's best interest.

First, at the time of trial, Ava was just over a year old. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal

23

time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The evidence at trial demonstrated that Ava was well cared for by her foster family. Ava was placed into foster care when she was just days old. And she has been with the same foster family for her entire life. Ava's foster father testified that she has bonded with their family, she is a part of their family, and they want to adopt her. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming that termination was in child's best interest when child was thriving in foster care). DFPS also introduced evidence that Ava's foster home is safe and provides for all of her needs. *See In re J.D.*, 436 S.W.3d at 118 (considering, in assessing child's physical and emotional needs, evidence that child had been in foster home for most of her life, foster family provided safe and stable home and planned to adopt her as evidence supporting trial court's best interest finding).

In contrast, at the time of trial, Father had visited with Ava only four times—twice within a few weeks of her birth and twice when she was a few months old. Although the evidence reflects that Father acted appropriately during these visits, the last visit occurred in September 2023 and Father's visitation rights were ultimately terminated due to "nonengagement." And Father did not seek to have his visitation rights reinstated.

24

Moreover, at the time of trial, Father was incarcerated and had not seen Ava in almost 10 months. Unless a parent has a valid excuse for his absence from a child's life, we have long considered evidence of little or no contact with the child to be proof that weighs heavily in favor of a trial court's best-interest finding. *See In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("Parental absence or lack of involvement is especially telling with respect to the best interest of very young children, like babies and toddlers, due to their inherent vulnerability and particular need for parental attention and nurturing.").

Although Father testified that he had visited with Ava "more than twice," he could not remember the exact number of visits. He contended that he may have missed a few visits or been late because his ride was late or never showed up. The trial court could have chosen to disbelieve Father's explanations or could have reasonably found them to be inadequate for his failure to have any contact with Ava for approximately 10 months. *See In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *9 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.); *In re J.W.*, 645 S.W.3d at 741 ("[F]actfinder remains the sole arbiter of the witnesses' credibility and demeanor" (internal quotations omitted)).

Next, as detailed above, the evidence shows that Father has a history of drug use, including cocaine and methamphetamine, which continued during the pendency of this case. Father testified at trial that his drug use, particularly of cocaine, dates

25

back to 2001. Drug testing results entered into the record showed eleven positive tests between 2019 and 2023. And two of those occurred during the pendency of this case.

This evidence of Father's past pattern of drug use "is relevant, not only to his parenting abilities and to the stability of the home he would provide, but also to the emotional and physical needs of his child, now and in the future, and to the emotional and physical danger in which the child could be placed, now and in the future." *See In re N.J.H.*, 575 S.W.3d at 834; *Holley*, 544 S.W.2d at 371–72 (factors two, three, four, and seven); *see also In re C.H.*, 89 S.W.3d at 28 (holding that same evidence may be probative of both section 161.001(b)(1) and best-interest grounds).[10]

"A factfinder may afford great weight to the significant factor of drug-related conduct." *In re N.J.H.*, 575 S.W.3d at 834. A parent's drug use is a condition indicative of instability in the home environment because it exposes a child to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Here, evidence of Father's past drug use, coupled with the evidence that Father failed drug tests during the pendency of this case—while he was aware that his parental rights

---

[10]     *See also In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (finding pattern of illegal drug use suggested mother was not willing and able to provide child with safe environment—a primary consideration in determining child's best interest).

to Ava were at issue—supports an inference that Father is at risk for continuing substance abuse. *See In re K.W.*, 2024 WL 116938, at *10; *In re R.J.*, 579 S.W.3d at 118 (recognizing that trial court may measure parent's future conduct by his past conduct).

Additionally, as detailed above, Father's criminal conduct that occurred both before and after Ava's birth, also supports the trial court's finding that termination of his parental rights was in Ava's best interest. *See In re K.W.*, 2024 WL 116938, at *10 (considering father's history of engaging in criminal conduct and domestic violence in best interest analysis); *see also In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *18 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.).

Thus, viewing all the evidence in a light most favorable to the trial court's best-interest finding, and considering undisputed evidence to the contrary, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights is in Ava's best interest. *See In re K.W.*, 2024 WL 116938, at *10. Furthermore, considering the entire record, including evidence both supporting and contradicting the trial court's finding, a factfinder reasonably could have formed a firm belief of conviction that termination of Father's parental rights is in Ava's best interest. *See id.*

We therefore hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See id.*

We overrule Father's fourth issue.

### Sole Managing Conservatorship

Lastly, Father argues in his fifth issue that the trial court erred in appointing DFPS as the sole managing conservator of Ava.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *In re J.D.G.*, 570 S.W.3d at 856. Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating his parental rights, the trial court's appointment of DFPS as sole managing conservator may be considered a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856; *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citation omitted).

28

Because we have overruled Father's challenges to the portion of the trial court's order terminating his parental rights, the order divested Father of his legal rights and duties related to Ava. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Consequently, Father lacks standing to challenge the portion of the order appointing DFPS as Ava's conservator. *See In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (affirming termination of father's parental rights and holding that father, who had been divested of his legal rights to child, lacked standing to challenge portion of order appointing DFPS as child's conservator); *In re J.D.G.*, 570 S.W.3d at 856 (same).

We also overrule Father's fifth issue.

## Conclusion

Accordingly, for all of the reasons above, we affirm the trial court's Decree for Termination in all things.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.