# Supreme Court of Texas

---

No. 23-0965

---

In the Interest of N.L.S. and E.J.C. a/k/a E.J.C., Children

---

On Petition for Review from the
Court of Appeals for the First District of Texas

---

**PER CURIAM**

CHIEF JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Devine and Justice Sullivan joined.

In this appeal of a judgment terminating Father's parental rights, we are asked whether legally sufficient evidence supports the trial court's finding that Father engaged in conduct that endangered his child's physical or emotional well-being. The court of appeals reversed the termination judgment, holding that there was legally insufficient evidence to support the finding. However, the court of appeals' analysis conflicts with our recent opinions in *In re R.R.A.*, 687 S.W.3d 269 (Tex. 2024), and *In re J.F.-G.*, 627 S.W.3d 304 (Tex. 2021). Based on our reasoning in those opinions, we hold that legally sufficient evidence supports the trial court's endangerment finding. Accordingly, we reverse the court of appeals' judgment as to Father and remand to that court to reach the unaddressed issues of whether factually sufficient

evidence supports the endangerment finding and whether legally and factually sufficient evidence supports the trial court's determination that termination is in the child's best interest.

**I**

In 2021, N.L.S. was living with his mother. A neighbor called the police to report that N.L.S., who was five years old at the time, had come to the neighbor's house several mornings in a row hungry and wearing the same dirty clothes. The neighbor said that N.L.S. stayed at her house for hours and no parents checked on him.

In response to the neighbor's call, the police performed a welfare check at Mother's residence. When the police arrived, N.L.S. answered the door and said he was alone. The officers searched the home but did not find a caretaker. They took N.L.S. to the police station and contacted the Department of Family and Protective Services. Officers later returned to the residence and found Mother, her infant daughter (E.J.C.),[1] and another adult. Both children were taken into the Department's custody.

Father has an extensive and escalating criminal history. Since 2008, he has been convicted of twelve crimes, including at least five felonies. He has twice been convicted of family violence, though neither of those convictions involved N.L.S. or Mother. He has twice been convicted of drug possession; one of those convictions stems from an arrest for possession of methamphetamine on the same day he visited

---

[1] E.J.C. is not Father's child. The Department terminated E.J.C.'s father's parental rights and appointed the Department as E.J.C.'s sole managing conservator. E.J.C.'s father did not appeal.

N.L.S. at Mother's home prior to N.L.S.'s removal. Father's other convictions include burglary, theft of a firearm, felon in possession of a firearm, evading arrest, and credit card abuse. His most recent conviction was in 2021—six months before N.L.S.'s removal—on five counts: (1) felon in possession of a firearm; (2) possession of a prohibited weapon; (3) evading arrest or detention; (4) assault of a family member; and (5) possession of methamphetamine. He received a five-year sentence and was incarcerated when his parental rights were terminated.

Father has been incarcerated for much of N.L.S.'s life but has spent time with N.L.S. between his sentences. He was incarcerated when N.L.S. was born in 2015. Father lived with N.L.S. and Mother for two months in 2018, and he testified that after that, he visited N.L.S. "[q]uite a few times." The last time he saw N.L.S. was in 2019 when N.L.S. was three years old.

After the Department initiated this suit, a caseworker met with Father in jail six or seven times. At trial, the same caseworker testified that during one of those visits, Father "stated that [Mother] was not a good mother" and "was never home" and that he was "the one taking care of [N.L.S.]" when he and Mother were "together." But when Father testified, he denied making those statements. He further testified that Mother was an attentive parent when they lived together and that her home was clean. When he visited them, he said, he had no concerns that Mother neglected N.L.S. He testified that he did not know Mother used drugs or had a history with the Department.

The Department's service plan did not require Father to complete any services. He testified that he worked seven days a week as a welder for the sheriff's department and attended GED classes while incarcerated. He further testified that he was working through parenting papers provided by the Department but had not completed them. He planned to attend narcotics anonymous classes in prison, and he testified that he requested video visits with N.L.S. but did not receive a response to that request. The Department caseworker testified that she did not recall Father asking for video visits.

When asked whether he had a relationship with N.L.S., Father responded that he was incarcerated when N.L.S. was born so he did not "have much of a relationship with him," but N.L.S. "knows who [Father is]." Father did not know N.L.S.'s grade in school, favorite subject, favorite color, or favorite food. Father testified that, at the time of his testimony, he could not provide N.L.S. with a safe and stable home.

N.L.S.'s guardian ad litem recommended that Father's parental rights be terminated because his conduct "subjected [N.L.S.] to a life of uncertainty and instability that[] endanger[ed] [N.L.S.'s] physical and emotional well-being." Specifically, Father's repeated incarcerations left N.L.S. "in a state of flux" because he did not know if Mother or Father could be "going to . . . jail one day or the next."

After a bench trial, the trial court rendered judgment terminating Father's parental rights to N.L.S., finding that Father engaged in conduct or knowingly placed N.L.S. with persons who engaged in conduct endangering N.L.S.'s physical or emotional well-being under Family Code Section 161.001(b)(1)(E) and that termination was in

4

N.L.S.'s best interest. The trial court also appointed the Department N.L.S.'s sole managing conservator.[2] Father appealed, challenging the legal and factual sufficiency of the evidence to support both findings.

The court of appeals reversed the judgment terminating Father's parental rights and rendered judgment denying the Department's petition for termination. ___ S.W.3d ___, 2023 WL 6627526 (Tex. App.—Houston [1st Dist.] Oct. 12, 2023). The court held the evidence was legally insufficient to support termination under Subsection (E) because the Department failed to establish "a causal link between [F]ather's criminal conduct and any alleged endangerment to N.L.S." *Id.* at *35. Because the court reversed on that ground, it did not address Father's factual-sufficiency challenge to the Subsection (E) finding or Father's legal- and factual-sufficiency challenges to the best-interest finding. The Department petitioned this Court for review.

## II

"The Family Code authorizes the termination of parental rights when a factfinder decides that (1) a parent's conduct has met a statutory ground for termination; and (2) termination is in the child's best interest." *R.R.A.*, 687 S.W.3d at 271. The factfinder must make those findings by clear and convincing evidence, TEX. FAM. CODE § 161.001(b), which is "the measure or degree of proof that will produce in the mind

---

[2] The trial court also terminated Mother's parental rights to both N.L.S. and E.J.C. The court of appeals affirmed the judgment terminating Mother's parental rights, ___ S.W.3d ___, 2023 WL 6627526, at *36 (Tex. App.—Houston [1st Dist.] Oct. 12, 2023), and Mother did not petition this Court for review.

of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established," *id.* § 101.007.

The Department argues here that there is legally sufficient evidence that Father engaged in conduct that endangered N.L.S. We agree.

**A**

The statutory ground for termination at issue is Section 161.001(b)(1)(E) of the Texas Family Code. It applies when a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). "Endanger" in this context means to "expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is "not necessary that the [parent's] conduct be directed at the child or that the child actually suffers injury." *Id.*

In *R.R.A.*—decided after the court of appeals' decision here—this Court considered the meaning of "endanger" in Section 161.001(b)(1)(P), a termination ground that applies when a parent "used a controlled substance . . . in a manner that endangered the health or safety of the child." 687 S.W.3d at 276-77; TEX. FAM. CODE § 161.001(b)(1)(P). Relying in part on our interpretation of "endanger" in Subsection (E), *Boyd*, 727 S.W.2d at 533, we held that "endangerment does not require a parent's drug use to directly harm the child." *R.R.A.*, 687 S.W.3d at 278. Rather, "a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *Id.*

6

Father argues that *R.R.A.* is limited to drug-use cases. That is incorrect. "When the Legislature uses substantially the same words and phrases in a statute, subsequent uses of that same word in the same subject area ordinarily carry the same meaning." *Id.* at 277. For that very reason, as noted, in *R.R.A.* we expressly relied on our earlier interpretation of Subsection (E). *Id.* at 278. Accordingly, we confirm that endangerment under Subsection (E), as under Subsection (P), "does not require [the parent's conduct] to directly harm the child." *See id.* The proper inquiry is thus whether there is evidence that Father exhibited a pattern of behavior presenting a substantial risk of harm to N.L.S. *See id.*

**B**

Applying the correct standard, we hold that legally sufficient evidence exists to uphold the trial court's endangerment finding. In reviewing legal sufficiency, we "'view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility,' and dealt the closest with the evidence at hand." *Id.* at 276 (quoting *J.F.-G.*, 627 S.W.3d at 315). We "reverse only if 'no reasonable factfinder could form a firm belief or conviction' that [the trial court's] finding is true." *Id.* at 281 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

As the court of appeals correctly recognized, "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533-34. However, we have made clear that "[a] parent's criminal history—taking into account the nature of the crimes, the

7

duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *J.F.-G.*, 627 S.W.3d at 313; *see also id.* at 314 ("Lengthy incarceration presents a risk of endangerment to the child's well-being . . . .").

In *J.F.-G.*, there was evidence that the "father committed increasingly serious crimes—among them, possession of a controlled substance, sale of marijuana, and robbery." *Id.* at 315. We held that legally sufficient evidence supported termination of the father's parental rights under Subsection (E), "not[ing], specifically: his absence from [the child's] childhood for more than eight years; his history of dealing drugs; his choice not to monitor her safety during his incarceration; and his minimal effort to contact [the child] or be part of decisions regarding her health, education, or well-being." *Id.* at 317-18; *see also id.* at 315 (holding that "evidence [of criminal conduct]—which in this case includes multiple criminal episodes of escalating seriousness—together with the duration and consequences of the incarceration, is relevant when the resulting abandonment presents a risk, as it did here, to a child's physical or emotional well-being").

As in *J.F.-G.*, Father's pattern of escalating convictions supports the endangerment finding. Specifically, as outlined above, Father has been convicted of increasingly serious crimes since 2008—among them, drug possession, burglary, theft of a firearm, felon in possession of a firearm, evading arrest, credit card abuse, and family violence. *See Walker v. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Abusive and violent criminal conduct by a parent can produce an environment that

8

endangers the well-being of a child."). Although half of Father's crimes occurred before N.L.S.'s birth, courts may consider a criminal record beginning before a child's birth as evidence of an endangering course of conduct. *See J.F.-G.*, 627 S.W.3d at 315. And Father's endangering course of conduct continued after N.L.S. was born, with Father continuing to engage in criminal behavior resulting in incarceration.

Indeed, in orally announcing its decision to terminate Father's rights at the conclusion of the trial, the trial court noted "that during the entirety of [N.L.S.'s] life [Father has] either been under indictment for a felony or in prison on felony convictions." In *J.F.-G.*, we held that the father's eight-year absence from his eleven-year-old child's life "resulting from criminal conduct [was] sufficient evidence" to support an endangerment finding. *Id.* at 316. As was the case in *J.F.-G.*, Father's criminal conduct has prevented him from seeing N.L.S. since he was three years old, endangering N.L.S.'s physical and emotional well-being. *See Walker*, 312 S.W.3d at 617 ("Conduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child.").

The court of appeals focused on Father's testimony that he did not know N.L.S. would be endangered while in Mother's care. *See* 2023 WL 6627526, at \*35. Father contends this lack of knowledge forecloses a finding that he "knowingly placed [N.L.S.] with persons who engaged in [endangering] conduct." TEX. FAM. CODE § 161.001(b)(1)(E). We disagree for two reasons. First, this evidence was disputed by the caseworker's testimony regarding her discussions with Father about

9

Mother's ability to parent N.L.S., and the trial court was entitled to credit that evidence. *J.F.-G.*, 627 S.W.3d at 311-12 (discussing the required deference to the factfinder in evaluating witness credibility). Second, we rejected a similar argument in *J.F.-G.*, explaining that the father's "lack of knowledge" regarding his daughter's precarious living situation "resulted from criminal conduct that led to his incarceration and his indifference to his daughter while he was incarcerated." *Id.* at 315. So too here.

As in *J.F.-G.*, the evidence reflects Father's "choice not to monitor [the child's] safety during his incarceration[] and his minimal effort to contact [the child] or be part of decisions regarding [the child's] health, education, or well-being." *See id.* at 318. Father testified that he has never provided N.L.S. financial assistance, could not provide a safe and stable home for him, and could not provide the Department with any alternative placements. Father testified: "I was incarcerated when [N.L.S.] was born, so I don't have much of a relationship with him; but he knows who I am." Father did not know N.L.S.'s grade in school, favorite color, or favorite food. He did not know "a whole lot about" N.L.S. The guardian ad litem testified that N.L.S. had no emotional connection to Father and that N.L.S. believed E.J.C.'s father was his father. There is no evidence that Father took any measures to contact N.L.S. before the Department initiated these proceedings or to be part of decisions regarding N.L.S.'s well-being while incarcerated. Father testified that he requested video visits with N.L.S., but the Department caseworker did not recall him making such requests. Viewed in a light favorable to the trial court's findings, this testimony supports the trial

court's finding of endangerment based on Father's minimal effort to be part of N.L.S.'s life.

Accordingly, we hold that legally sufficient evidence supports the trial court's finding that Father's conduct endangered N.L.S. under Subsection (E).[3]

## III

We hold that the evidence is legally sufficient to support the trial court's finding that Father engaged in conduct that endangered N.L.S.'s physical or emotional well-being. Accordingly, without hearing oral argument, *see* TEX. R. APP. P. 59.1, we grant the Department's petition for review and reverse the portion of the court of appeals' judgment reversing the termination judgment as to Father. We remand to the court of appeals to review whether the evidence was factually sufficient to support the Subsection (E) finding and whether the evidence was

---

[3] Although the court of appeals did not reach Father's sufficiency challenges to the trial court's best-interest finding, in its merits brief here the Department asks us to do so in the first instance, at least with respect to the legal-sufficiency challenge. We decline for two reasons. First, the Department did not present it as an issue in its petition for review, identifying only the court of appeals' error in evaluating the legal sufficiency of the evidence to support the Subsection (E) finding. *See* TEX. R. APP. P. 53.2(f) ("The petition must state concisely all issues or points presented for review."). Second, even if we were to address the issue and agree with the Department that legally sufficient evidence supports the best-interest finding, we would still need to remand to the court of appeals to address Father's factual-sufficiency challenges to both of the trial court's findings, and we lack jurisdiction to consider those challenges. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("[T]his Court does not have jurisdiction to conduct a factual sufficiency review . . . .").

legally and factually sufficient to support the finding that termination is in N.L.S.'s best interest.

**OPINION DELIVERED:** June 13, 2025